428 F.2d 981
 Emmett THOMAS, Nicholas J. Haydock and John D. Jillson, Trustees of the Anthracite Health and Welfare Fund
v.
HONEYBROOK MINES, INC.
Charles Nedd, Dominic Iero, Max Dynoski and Anthony Ganly, Members of the Pensioned Anthracite Coal Miners Protest Executive Committee, Suing on Behalf of Themselves and All Other Members of the Class of Pensioned Anthracite Coal Miners and Widows of Deceased Pensioned Anthracite Coal Miners (Intervening Plaintiffs-Intervenors in D. C.), Appellants.
 No. 17939.
 United States Court of Appeals, Third Circuit.
 Argued March 19, 1970.
 Decided May 28, 1970.
 Rehearing Denied August 5, 1970.
 
 John R. McConnell, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellants.
 Thomas N. O'Neill, Jr., Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellees.
 Before McLAUGHLIN, FREEDMAN and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 The intervenors, members of the Pensioned Anthracite Coal Miners Protest Executive Committee (hereinafter the Committee), appeal from the denial of their motion to direct the payment of their counsel fees out of a fund. The fund in question represents recoveries made by the trustees of the Anthracite Health and Welfare Fund of the United Mine Workers of America (hereinafter the Fund), from certain coal operators who were delinquent in royalty payments specified in the industry collective bargaining agreements. The lawsuit against Honeybrook Mines was filed in May of 1964 and the committee's motion to intervene was granted in December of 1965. In addition to the Honeybrook Mines suit, thirty-five other lawsuits against delinquent mine operators were later filed by the Fund trustees. A fee application was made and denied in each case. Timely notices of appeal were filed in each case, but by agreement of counsel only the appeal in the instant case was docketed in this court. In all, judgments in excess of $1,900,000. have been obtained, settlements in excess of $800,000. have been accepted, and agreements have been made with many delinquent coal operators for the payment of approximately $4,280,000. The committee contends that it was largely responsible for the accomplishment of these results, and that its counsel fees should be paid from the resulting fund. The district court did not agree.
 
 
 2
 The essence of the decision appealed from may be found in this language of the district court:
 
 
 3
 It may well be that the lawsuits against the delinquent operators would not have been started had not the pensioned miners group brought their actions against the United Mine Workers in the Eastern District and Middle District Federal Courts, but it would be pure guesswork for me to so conclude on the basis of the evidence before me. Even if I were to so conclude, however, this would still fall far short of the findings necessary to support a conclusion that the amounts recovered by the Trustees were created by the efforts of intervenors counsel. Their efforts may have been meaningful and commendable, but they did not rise to the level, in the suits before me, to justify an award of counsel fees to them out of the amounts recovered by the Trustees. (101a-102a)
 
 
 4
 That court thus made (1) a finding of fact that there was no evidence that the lawsuits against the delinquent mine operators were the result of the litigation and other activities pursued by appellants, and (2) a conclusion of law that even if the lawsuits against the delinquent mine operators would not have resulted but for appellants' activities, the expenses of those activities are not recoverable from the resulting fund. The finding of fact is clearly erroneous, and the conclusion of law is wrong.
 
 THE FACTS
 
 5
 The Anthracite Health and Welfare Fund came into existence under the terms of the Anthracite Wage Agreement of June 7, 1946. That agreement provided that the Fund would be managed by three trustees, two appointed by the President of the United Mine Workers of America and one appointed by the Anthracite Operators, (21a). The Fund, resulting from royalty payments by coal operators on anthracite production, was intended to provide pensions to retired miners. When, in November, 1961, the pensions, which were originally to be $100. a month, were finally reduced to $30. a month, discontent in the coal regions led to the establishment of the Pensioned Anthracite Coal Miners Protest Executive Committee. Beginning in 1961, members of this committee met with Thomas Kennedy, who was concurrently chairman of the trustees of the Fund and International President of the United Mine Workers of America, and with Mart F. Brennan, who was concurrently a trustee of the Fund and President of District 7, United Mine Workers of America. The committee members were informed that the reductions in pension payments were necessitated by delinquencies in royalty payments.
 
 
 6
 When, in February, 1962, the committee requested the names of coal companies which were delinquent, the Fund trustees refused to disclose this information, (33a; 86a). When the committee retained counsel and counsel, in September, October and November, 1962 sought the same information, the trustees again refused, (33a; 87a). The efforts to obtain this information continued, by requests to the trustees by interrogatories in various lawsuits, and pursuant to the Welfare and Pension Plan Disclosure Act, 29 U.S.C. § 301 et seq. (1964), (34a). A partial disclosure was made on October 11, 1965, (34a).
 
 
 7
 The refusal of the Fund trustees to disclose to representatives of the cestuis of the trust the names of the delinquent operators is admitted (55a) but explained thus:
 
 
 8
 * * *; that counsel for applicants were informed by the trustees that in the judgment of the trustees such information might have a serious effect on the credit of the companies involved and the future of the Fund if such information were made public, except by way of actions to collect the delinquencies. (Brennan affidavit, 55a).
 
 
 9
 To us this explanation has a hollow ring. But taking it at face value, in November, 1962 the committee and counsel were confronted with this situation:
 
 
 10
 (1) They knew or could learn from public records the production of each company.
 
 
 11
 (2) They knew, or could learn from public records, therefore, how much in royalties should have been collected.
 
 
 12
 (3) They were informed by the Fund trustees of extensive delinquencies.
 
 
 13
 (4) The trustees of the Fund declined to disclose to the very beneficiaries of the trust which companies were delinquent, for fear of harm to the credit of the companies!
 
 
 14
 Now it may be that for the overall health of the admittedly ailing anthracite industry, (62a), the trustees should have been cautious in permitting pressure to be put on the delinquent companies. But that is not the issue here. The pensioned miners were not interested in the health of the industry, but in payments from the Fund. Thus, the situation was analogous to a dispute between income beneficiaries looking for short term returns, and remaindermen looking for safety and possible capital appreciation. Here the record of decisions of the trustees showed consistent concern for the anthracite industry at the quite evident expense of current payments to the pensioners. That this policy of the Fund trustees may have been sounder in the long run (a matter of speculation) is irrelevant if in fact the activities of the committee and its counsel forced a change in the direction of the Fund which benefited the class of current income beneficiaries.
 
 
 15
 Faced, in 1961 and 1962, with the obvious reluctance of the Fund trustees to rock the boat, the committee counsel commenced their own investigation of public records of the United States Department of Labor, the Pennsylvania Department of Internal Affairs, the Pennsylvania Department of Mines and Mineral Industries, the Corporation Bureau of the Pennsylvania Department of State, and the courthouse records of the anthracite producing counties, (87a). A comparison of the production records in the Pennsylvania Department of Mines and Mineral Industries with the Fund reports filed with the United States Department of Labor disclosed that millions of dollars in royalties remained unpaid, (88a). The collection activities by the Fund trustees disclosed in the court records (outlined in the affidavit of Charles Nedd, 25a-33a) fell far short of convincing the committee that the delinquent operators were being pursued with the diligence which might restore the pension cuts.
 
 
 16
 In March, 1963, the committee commenced a class action against the United Mine Workers of America to collect for the Fund beneficiaries the amount of the delinquent payments, on the ground that the Union had failed to enforce the royalty payment provisions of the agreements. Although this suit was dismissed on jurisdictional grounds, Nedd v. United Mine Workers of America, 225 F.Supp. 750 (E.D.Pa.1963), aff'd., 332 F.2d 373 (3 Cir. 1964), it cannot be ignored for purposes of the present application, if, as we believe, the record discloses that it was instrumental in prodding the cautious trustees into more aggressive action. It was on May 18, 1964, three days before the argument in this court on the appeal from dismissal of the committee's first lawsuit, and fourteen months after that suit had been filed, that the Fund trustees finally filed the complaint against Honeybrook Mines which resulted in recoveries here in issue. A suit against a second operator (Northwest Mining Company) was filed on December 9, 1964.
 
 
 17
 On January 21, 1965 the committee filed a new lawsuit against the United Mine Workers of America, Civil Action No. 8796, in the District Court for the Middle District of Pennsylvania. Jurisdiction was based on Section 301 of the Labor-Management Relations Act (Taft-Hartley Act), 29 U.S.C. § 185(a) et seq. (1964), and the committee attempted to join the Fund trustees as involuntary plaintiffs. The trustees resisted being joined and the union claimed lack of jurisdiction. This court, in Nedd v. United Mine Workers, 400 F.2d 103 (3 Cir. 1968), eventually held that there was probable federal jurisdiction under 28 U.S.C. § 1337 (1964), and that the trustees of the Fund were necessary parties. On remand an amended complaint was filed and that case is still pending. The district court made reference to that lawsuit in its memorandum denying the committee's fee application, (103a). It ignored the undisputed fact that it was not until after the second committee lawsuit was filed that the Fund trustees finally started suit against some thirty-three additional delinquent operators, many for delinquencies of long standing, (90a).
 
 
 18
 In explanation of the delay between early 1962, when the committee first began to exert pressure on behalf of the pensioned miners, and March, 1964, when the Honeybrook Mines action was filed, or more precisely between 1962 and 1965 and 1966, when the bulk of the delinquency suits were filed, the Fund trustees assert their fear that the operators would plead in defense a violation of Section 302(c) (5) of the Labor-Management Relations Act of 1947 (Taft-Hartley Act), 29 U.S.C. § 186(c) (5) (1964). Thus, they say, on advice of counsel they delayed suit until the amendment of the welfare fund provisions in the Anthracite Wage Agreement of September 1, 1964.
 
 
 19
 There is no explanation for the delay in pressing for a change in the welfare fund provisions between 1947, when Section 302(c) (5) was enacted (Act of June 23, 1947, Ch. 120, § 302(c) (5), 61 Stat. 157), and September 1, 1964, when the anthracite wage agreement was amended. In view of the fact that the Honeybrook Mines suit was filed in May of 1964, and that a number of other suits had been filed between 1954 and 1961, (23a-33a), the trustees' explanation induces a certain degree of skepticism. Moreover, it must be contrasted with trustee Brennan's admitted concern with the credit standing of the coal operators, (55a). But in any event the explanation is additional proof that, continuing until well into 1964 at least, the Fund trustees continued to drag their feet while the committee continued to press for prompt action.
 
 
 20
 Exhibits in the record outline the history of the severe downturn of the anthracite industry over the twenty years during which the delinquencies were permitted to accumulate, and this downturn is urged by appellees as a factor that could not have been ignored by the trustees in deciding how best to approach the delinquent payment problem. True enough; and the weight which the Fund trustees could properly give to the condition of the industry, when balanced against their obligation to the present Fund beneficiaries, probably will be determined in the second committee (Middle District) lawsuit. But the issue on the fee application is not whether or not the trustees' approach to the industry was sounder than that of the committee. It is, rather, whether or not the committee, which vehemently disagreed with that approach, by its activities helped to create a fund for the class for which it acted. The district court concluded that such a finding would be "pure guesswork." We conclude that on the record before us any other finding is clearly erroneous.
 
 THE LAW
 
 21
 The district court concludes that even if the delinquency lawsuits would not have been started had not the pensioned miners' group started their actions, the Fund still could not be charged with committee counsel fees when the trustees were the actual plaintiffs. This is a far too narrow view of the applicable rule. Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1881), is the seminal case, and subsequent developments are reviewed in Judge Adams' opinion in Kahan v. Rosenstiel, 424 F.2d 161 (3 Cir. 1970). Both that case and Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), on which it relies, indicate that the equitable rule against saddling the active representative of a class with the entire expenses of legal efforts of benefit to all should not be applied in a narrow technical manner. Powell v. Pennsylvania Railroad Co., 267 F.2d 241 (3 Cir. 1959), is directly in point, unless we accept the district court's finding that there was insufficient evidence of a relationship between the fund and the committee activities. We have rejected that finding. We hold that committee activities forced the Fund trustees to commence the delinquency lawsuits, that these lawsuits produced the fund and that the committee's counsel fees and expenses incurred in bringing about the delinquency lawsuits are properly payable out of the Fund.
 
 
 22
 The order of the district court denying intervenors' motion to direct the payment of its counsel fees will be reversed and the case will be remanded to the district court which should make an award of counsel fees appropriate under the circumstances of the case, taking into account not only services rendered during the course of the delinquency lawsuits, but also services rendered in bringing about the change in the Fund trustees' approach.
 
 
 23
 GERALD McLAUGHLIN, Circuit Judge (dissenting).
 
 
 24
 I must respectfully dissent from the conclusion reached by the majority. I do so primarily because it is self-evident from the record before us that the findings made by Judge Nealon in his carefully reasoned opinion are not "clearly erroneous."
 
 
 25
 In Speyer, Inc. v. Humble Oil and Refining Company, 403 F.2d 766, 770 (3 Cir. 1968), cert. denied, 394 U.S. 1015, 89 S.Ct. 1634, 23 L.Ed.2d 41 (1969), Judge Aldisert recently reiterated the guidelines this Circuit should follow in reviewing findings of fact.
 
 
 26
 "In reviewing the decision of the District Court, our responsibility is not to substitute findings we could have made had we been the fact-finding tribunal; our sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i. e., whether we are `left with a definite and firm conviction that a mistake has been committed'. Eastern Express, Inc. v. Mack Warehouse Corp., 326 F.2d 554 (3 Cir. 1964); International Industries, Inc. v. Warren Petroleum Corp., 248 F.2d 696 (3 Cir. 1959), cert. denied, 355 U.S. 943, 78 S.Ct. 529, 2 L. Ed.2d 523 (1959); Williams v. Babcock & Wilcox Co., 262 F.2d 253 (3 Cir. 1959), cert. denied, 359 U.S. 969, 79 S.Ct. 880, 3 L.Ed.2d 836 (1959)." (Emphasis supplied.)
 
 
 27
 As the majority notes, it is most significant that Judge Nealon found the following:
 
 
 28
 "It may well be that the lawsuits against the delinquent operators would not have been started had not the pensioned miners group brought their actions against the United Mine Workers * * *, but it would be pure guesswork for me to so conclude on the basis of the evidence before me. * * * Their efforts may have been meaningful and commendable, but they did not rise to the level, in the suits before me, to justify an award of counsel fees to them out of the amounts recovered by the Trustees." (101a-102a). (Emphasis supplied.)
 
 
 29
 Despite this definitive finding by the district court that there was insufficient evidence to justify a holding that intervenors' actions were the cause of the creation of the "fund" in question, and despite Judge Nealon's emphatic ruling that it would be "pure guesswork for me to so conclude on the basis of the evidence before me," the majority nonetheless asserts that these findings are clearly erroneous. What the majority has done today amounts to a substitution of its findings for those made by the district court. The evidence presented is sparse, and this undoubtedly creates a situation wherein this Court reviewing the facts de novo, if that were our function, might conclude contrariwise to the district court, but even then such conclusion would have little support in the record.
 
 
 30
 The majority opinion sets out the facts briefly tracing the history of the Anthracite Health and Welfare Fund, and the circumstances surrounding the most unfortunate and substantial reductions in the pension payments received from that Fund by the retired miners. The efforts of the Pensioned Anthracite Coal Miners Protest Executive Committee and its counsel are detailed, and the actions of the Trustees in starting various suits, settling some, recovering judgments in others, etc. are described. It is undisputed that the proofs indicated that it was not until approximately March 1964, when the instant suit was commenced, that the Trustees vigorously began to pursue in court mine operators who were delinquent in their payments to the Fund, although several actions had been filed by the Trustees in the period 1954-1961. The majority, however, would have it that the suits filed by the Committee at approximately the same time were instrumental in bringing about recoveries to the Fund. Parallelism of actions in time is not proof that the actions of the Trustees and the Committee were interrelated; much less is it proof that the actions of the Committee caused the Trustees to act, or the "fund" to be created. Indeed, the time sequences of the actions of the Trustees and the Committee before us are not so coincidental as to overpower the conclusion that a cause and effect relationship was not present, and even less so, Judge Nealon's finding, which is simply that there was insufficient evidence to show that these actions had a causal connection.
 
 
 31
 The Pensioned Anthracite Coal Miners Protest Executive Committee was established and began its efforts in 1961. In March 1963, the Committee's first suit was filed, but though the defendant (the United Mine Workers of America) was successful in having it dismissed on jurisdictional grounds, the majority concludes "the record discloses that it was instrumental in prodding the cautious trustees into more aggressive action." Later the majority goes on to argue that it was just prior to argument in this Court on the Committee's appeal from the dismissal of its action that the suit against Honeybrook Mines, the instant action, was filed by the Trustees. Since the Committee's suit had been dismissed, with this Court affirming the dismissal, 332 F.2d 373, I fail to see how Judge Nealon can be said to have been clearly erroneous in not finding that this Committee action was instrumental in creating the recoveries ultimately recouped by the Trustees. Not only was the union consistently successful in having the district court dismiss the Committee's first action and in having that dismissal affirmed on appeal, but the Trustees were not even parties to that first suit. It is as though the majority seeks to draw an affirmative conclusion from a nonhappening; if jurisdiction had been sustained in the first suit brought by the Committee and if the Trustees had been party defendants, the majority's conclusion might be more plausible. The importance of the second suit filed by the Committee to the majority's theory is still more dubious because though it was filed in January 1965, (after the Trustees started suit) it was not until August 1968 that this Court decided that if the Committee's complaint was amended, and if the Trustees were joined as parties, the Committee would then have a valid cause of action. 400 F.2d 103. On January 23, 1969, the Committee did finally amend its complaint naming the Trustees as defendants. However, by that time judgment had already been entered in this case and the Committee's motion to direct payment of counsel fees had been filed on September 19, 1968, months before the Trustees were made defendants in the Committee's second suit.
 
 
 32
 The first suit brought by the Committee (which, as has been stated, the majority feels "* * * was instrumental in prodding the cautious trustees into more aggressive action") was not filed until March 11, 1963, although Judge Nealon found that prior to the filing of the suit, "between August, 1962, and March 6, 1963, agreements for the payment of delinquent royalties were negotiated by the Trustees with twenty-three anthracite operators and approximately $4,279,146.81 in delinquencies have been collected as a result of these agreements." Actually, the majority comment that "In all, judgments in excess of $1,900,000. have been obtained, settlements in excess of $800,000. have been accepted, and agreements have been made with many delinquent coal operators for the payment of approximately $4,280,000.",[1] overlooks the true then existent situation that the agreements for the payment of the $4,280,000. were entered into prior to the filing of any suits by the Committee and that the judgments of $1,900,000., and the settlements of $800,000. were entered prior to the naming of the Trustees as defendants by the Committee.
 
 
 33
 In the instant cause in which the application for counsel fees before us was made, some fifteen months after this suit was commenced by the Trustees, the Committee intervened without filing any new pleading. Judge Nealon found that there was no evidence adduced or argument made by the Committee that the Trustees did not diligently prosecute this, and its companion actions. Although under Sprague v. Ticonic Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), it is well settled that substance and not form is to govern whether or not counsel fees should be awarded out of a particular fund, the position of the Committee here as intervenors — who, the district court implicitly found, did not materially contribute to the plaintiffs' efforts — takes on added significance in view of the circumstance that an award of fees to the intervenors out of the recoveries for the Anthracite Health and Welfare Fund would tax that Fund twice for counsel fees as the fees of the Trustees' counsel are a legitimate expense of the Fund. On this phase of our problem it should be called to mind that when appellees' counsel noted[2] that there is no recorded decision granting counsel fees to intervenors in fund theory cases it is not just an assertion of form over substance; in intervenor situations such as this appeal it is generally not the intervenors but the plaintiff whose efforts have resulted in the creation of the fund.
 
 
 34
 In addition to my firm disagreement with the majority over Judge Nealon's factual determinations, I have great difficulty as to the majority's conclusion of law. The majority states the issue before us as follows:
 
 
 35
 "* * * the issue on the fee application is * * * whether or not the committee, * * * by its activities helped to create a fund for the class for which it acted." (Emphasis supplied.)
 
 
 36
 If the majority is of the opinion that the Committee is entitled to counsel fees simply for having "helped" to create the recoveries for the Fund, then this is a departure from existing case law and a wide expansion of the fund cases doctrine. In Powell, supra, urged on us by appellant and relied on by the majority, this Court held that recovery of fees was justified because plaintiff's efforts "created" the fund in question. 267 F.2d 241, 245. In this Circuit's recent Kahan opinion, supra, also cited by the majority, the Court stated that a necessary prerequisite for recovery of counsel fees was a determination that it was "the plaintiff's effort which caused others to benefit." (Emphasis supplied.) But if as strongly appears, the majority is concluding as a matter of law that the Committee's actions "produced"[3] the recoveries involved, I completely disagree. The plaintiff Trustees, and not the intervening Committee "produced" the fund before us.
 
 
 37
 Judge Nealon's opinion is sound, and I would affirm.
 
 
 
 Notes:
 
 
 [1]
 At 982
 
 
 [2]
 Appellees' brief, 12
 
 
 [3]
 At 987
 
 
 Opinion on Petition for Rehearing
 
 38
 PER CURIAM.
 
 
 39
 Appellees have filed a petition for rehearing by the court en banc which, except in one respect, raises no questions not already considered. That one respect is appellees' contention that the propriety of award of counsel fees by the intervenors was decided by the district court and this court on affidavits without an evidentiary hearing. The panel which heard this appeal was left with the impression that both sides consented to the submission of the fee question on affidavits. Upon review of the entire record, we conclude that there was no waiver by appellees of the right to an evidentiary hearing on any disputed fact issues. The opinion of the court is, therefore, amended to provide that the order of the district court denying intervenors' motion to direct the payment of its counsel fees will be reversed and the case will be remanded to the district court for a hearing on the fee application. In that hearing the district court should decide whether or not to grant such application, and the amount thereof, in the light of the legal principles announced in the opinion of the court. The petition for rehearing will be denied.