Emmett THOMAS et al., Plaintiffs,
and
Charles Nedd et al., Plaintiff
Intervenors,

v.

HONEYBROOK MINES, INC.,
Defendant,
and Related Cases.

Civ. Nos. 8499, 8757, 9053, 9054, 9055, 9100,
9267, 9431, 9543 and 9702.

United States District Court,
M. D. Pennsylvania.

April 13, 1973.

William Bruno (deceased), James S. Palermo, Hazleton, Pa., Morgan, Lewis & Bockius, Philadelphia, Pa., Charles A. Shea, Jr. and A. Richard Caputo, Wilkes-Barre, Pa., for involuntary plaintiffs.

Thomas N. O'Neill, Jr., Charles A. Wolfe, Philadelphia, Pa., James W. Scanlon, Scranton, Pa., Edward L. Carey, Washington, D. C., for defendant.

## MEMORANDUM

NEALON, District Judge.

Presently before the Court is a request for counsel fees by Intervenors, members of the Pensioned Anthracite Coal Miners Protest Executive Committee (hereinafter the Committee), from a fund produced as a result of lawsuits filed by the trustees of the Anthracite Health and Welfare Fund of the United Mine Workers of America against numerous coal companies. A previous application, supported solely by affidavits, was denied by this Court but this decision was reversed by the Court of Appeals, 428 F.2d 981 (3d Cir. 1970), and the case remanded for a hearing on the fee application "in the light of the legal principles announced in the opinion of the court." Hearings were scheduled on January 11, 12, and 13, 1972, and evidence received. Following the filing of the transcript, oral argument was held on September 28, 1972. Supplemental briefs were later submitted and the matter is now before the Court for disposition.

The following narration of events shall constitute findings of fact.

## FACTS

The Anthracite Health and Welfare Fund was created by the Anthracite Wage Agreement (hereinafter the Agreement) of June 7, 1946, and provided for the payment of a royalty on each ton of anthracite coal produced, from which pensions were to be paid to retired miners and death benefits to their families. The initial Agreement of June 7, 1946, called for the sum of 5¢ per ton on each ton of anthracite produced for sale or for use to be paid into the Fund; this was increased to 10¢ on July 10, 1947; 30¢ on March 16, 1950; 50¢ on October 1, 1952; and 70¢ on February 1, 1959. The Fund was to be managed by three trustees, two appointed by the United Mine Workers (hereinafter the Union) and one by the Anthracite Operators (hereinafter the Operators). With the passage of Section 302 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 186, which provided that the employees and employers be equally represented in the administration of such Fund, together with such neutral persons as may be agreed upon, one of the Union's appointees was designated as the "neutral" trustee. The amount initially paid by the Fund was $100 per month to each pensioner and death benefits of $1,000 to widows and dependents, but in 1954 the pension was reduced to $50 per month and the death benefit to $500.[1] During 1954, there were 90 producing coal operators subject to the Anthracite Wage Agreement and 65 were delinquent in their royalty payments. The record contains no information concerning the amounts delinquent prior to 1954, but on November 22, 1954, eleven lawsuits were commenced in State Courts seeking the payment of delinquencies amounting to $3,275,685.90. Most of these actions were never pursued beyond the complaint stage and only a small fractional amount was ever recovered. Additional lawsuits were commenced from 1955 through 1958, viz., one in 1955, four in 1956, seven in 1957, and six in 1958, with similar results. By the end of 1958, the number of delinquent operators had risen to one hundred and one (101), out of one hundred twenty-three (123) listed on the Fund's records, and the outstanding delinquencies to $8,225,711.23. While each operator was required under the original Agreement to submit a statement to the Fund reporting its monthly coal production, the Agreement was amended on May 20, 1959, by a supplement which required that the monthly reports be submitted under oath, and granted the trustees the right to station checkers on the operators' premises and to audit the operators' books to verify tonnage figures. In 1959 the Fund employed two men as checkers, expended $19,865.98 for audits and $3,250 for legal services. No legal actions were commenced in 1959. In 1960 the employment of the two checkers continued and $11,963.28 was spent for audits and $3,000 for legal services. No legal actions were commenced in 1960 although the number of delinquent operators increased to one hundred and eleven (111) out of one hundred and nineteen (119) and the outstanding delinquencies to $9,672,967.65. The receipts for 1960 amounted to $9,635,361.64, from which pensions of $10,008,716.13 were paid, and the Fund balance had shrunk to a low of $369,413.42. In June, 1961, the pension was further reduced to $30 per month and on June 17, 1961, there was a meeting of pensioned miners held at Coaldale, Schuylkill County, and at this meeting the Panther Valley Protest Committee was formed and one of the intervenors, Charles Nedd, was selected as Chairman. The Fund trustees at that time were Thomas Kennedy, President of the United Mine Workers of America; Harry J. Connolly, Chairman

---

1. A significant factor, of course, was the steady decline in anthracite production which records reveal dipped from 61 million tons in 1946 when the Fund was created to 16 million tons in 1961.

of the Board, Pennsylvania Coal Company; and Mart F. Brennan, President, District 7, United Mine Workers of America.[2] Commencing on June 26, 1961, Mr. Nedd and his Committee met with Mr. Brennan concerning the status of the Fund and the collection of delinquencies and were told by Brennan that he couldn't "close collieries down" because he didn't want to put working miners out of work. On December 14, 1961, Nedd and his Committee met with President Thomas Kennedy in Washington, D. C., and he stated similarly that the Union Executive Committee did not want to close down the operators and put men out of work. President Kennedy also refused to disclose the names of delinquent operators and the amounts of their delinquencies. In 1961, the employment of the two checkers continued and $916.95 was paid for audits and $2,500 for legal services. No legal actions were commenced in 1961, although the number of delinquent operators increased to one hundred and eighteen (118) out of one hundred and twenty-seven (127) and the outstanding delinquencies to $11,425,912.36. In January, 1962, Charles A. Shea, Esquire, a member of the Luzerne County Bar, was retained as Special Counsel to the Fund and, after reviewing the Fund files, became concerned (a) that the Welfare provisions of the Agreement did not comply with Section 302(c)(5) of the Labor Management Relations Act (noting that illegality of the Fund had been asserted as a defense in prior litigation brought by the Fund against the Operators),[3] and (b) that the trustees might not have the right to institute suit to collect delinquencies inasmuch as the agreement vested title in the trust-

ees of monies actually paid into the Fund but did not vest in them title to *claims* for monies owing to the Fund. Mr. Shea, consequently, recommended to the trustees that, prior to the institution of legal actions against delinquent operators, an effort be made to secure amendment of the agreement so that the language therein would conform to the Act and the possible disability of the trustees to sue removed. In the meantime, numerous mass meetings of pensioners, widows and their supporters were called by applicants throughout the anthracite region. Early in 1962, after United States Senator Joseph Clark recommended that the pensioners retain legal counsel, the Pensioners' Committee met with counsel and, on August 15, 1962, retained James S. Palermo, Esq., of Hazelton and William Bruno, Esq., of Philadelphia, as counsel for the Committee. In the summer and early autumn of 1962, various delinquent operating companies were struck by the Union and as a consequence, letter agreements for the payment of delinquencies were executed between seventeen (17) of the forty-three (43) delinquent companies, then operating, on the one hand, and on the other, certain officers of the International Union and Districts 1, 7 and 9, United Mine Workers of America, viz., W. A. Boyle, International Vice-Pres.; August J. Lippi, President, District #1; Mart F. Brennan, President, District #7; and Joseph Kershetsky, President, District #9. Mr. Shea participated in most of these conferences on behalf of the Fund and drafted most of the letter agreements. These agreements were negotiated and executed in the period from August, 1962, through March, 1963. On September 4, 1962, Messrs. Bruno and

2. Kennedy died in January, 1963, and was replaced by Emmett Thomas, Special Representative for Anthracite Affairs for Union; Connolly was succeeded by John D. Jillson, President of the Anthracite Institute on September 1, 1964; and Brennan resigned in February, 1967 and was replaced by Nicholas J. Hayduck as neutral trustee.

3. Specifically, Shea noted that there was no provision that the funds were to be set aside in an irrevocable trust to be used solely for the payment of benefits; no provision for breaking a tie; and the fact that Brennan, though jointly appointed by the Union and Operators, might not satisfy the neutrality requirement inasmuch as he was a Union official.

Palermo met with Mr. Brennan and Mr. Shea and were given a list of the companies which had paid royalties to the Fund in 1961, together with the amounts paid, but were not provided with a list of the delinquent operators. By letter dated October 11, 1962, to Brennan, with copies to the other trustees, Shea, John L. Lewis, President Emeritus, W. A. Boyle, Vice President, and John Owens, Secretary-Treasurer, of the United Mine Workers, Palermo and Bruno, as counsel for the Committee, requested that they be provided with information regarding the identity of the delinquent coal operators and the amount of delinquencies. Subsequent telephone inquiries of Brennan, Kennedy and Lewis were unsuccessful. By letter dated November 1, 1962, Bruno and Palermo again wrote to the trustees, with copies to Messrs. Shea, Lewis, Boyle and Owens, requesting the items sought in the letter of October 11 and advising that non-compliance would result in legal action. On November 9, 1962, Shea responded by letter to Palermo and agreed to make available for inspection and copying the annual audits of the Fund but stated that the other requests could not be granted pending a meeting of the trustees after which Palermo would be notified of their decision. While the employment of the two checkers continued through 1962, no audits were conducted and $2,154 was paid for legal services. No legal actions were commenced by the trustees in 1962 although there were one hundred twenty-five (125) delinquent operators (82 non-operating and 43 of 49 operating companies) and outstanding delinquencies of close to $12,000,000. In the latter part of 1962 and early 1963, Bruno and Palermo reviewed the production records of anthracite operators on file in the Department of Mines and Mineral Industries in Harrisburg, the Pennsylvania Department of Internal Affairs, the Corporation Bureau of the Pennsylvania Department of State, as well as State Court records and reports filed by the Union and the Fund with the United States Department of Labor and, satisfied that large amounts of royalty delinquencies existed, filed a complaint against the Union in the United States District Court for the Eastern District of Pennsylvania on March 11, 1963, in which it was averred that in excess of ten million dollars was owed the Fund and that the Union had failed to carry out the terms of the Anthracite Wage Agreement in that it had failed to collect all the royalty payments due. By letter dated July 30, 1963, Bruno and Palermo again wrote to the trustees, with copies to counsel for the Fund and counsel for the Union, in which they formally demanded that the trustees " . . . institute suits or otherwise recover on behalf of the beneficiaries the proper amount of royalty funds which are now delinquent" and stated that they had already brought one suit against the Union concerning this matter and may bring additional actions.

The Eastern District action was based on diversity of citizenship jurisdiction and on December 11, 1963, the District Court granted the Union's motion to dismiss for lack of diversity and an appeal was filed in the United States Court of Appeals for the Third Circuit. In the latter part of 1963 and early in 1964 results of the audits of certain coal companies, viz., Reading Anthracite Company, Trevorton Coal Company, Grant Anthracite Co., and Gap Anthracite Co., attempted by Lybrand, Ross Bros. & Montgomery were made known to the Trustees and revealed that these companies were not properly reporting or paying on their current production. At the end of 1963 there were approximately eight-five (85) non-operating companies which owed delinquencies to the Fund of approximately $6,700,000.00 and forty-three (43) operating companies, of which thirty-five (35) were delinquent in an amount estimated at $5,033,093.74. In 1963, the employment of the two checkers continued and $24,319.97 was paid for audits and $22,950 for legal fees. At a meeting of the trustees held

on April 8, 1964, it was reported that Honeybrook Mines, Inc., was not cooperating with the Fund's auditors [4] and the trustees decided to commence a Federal action against Honeybrook and against all other delinquent operators. On April 20, 1964, a resolution was adopted by the trustees incorporating new rules and regulations with respect to the operation of the Fund in order to bring it into conformity with the Labor-Management Relations Act of 1947. On May 18, 1964, the complaint against Honeybrook seeking delinquencies going back to 1959 was filed in this Court; this being the first litigation commenced by the trustees against an operator since August 29, 1958. On May 29, 1964, Bruno and Palermo again wrote to the trustees and their counsel inquiring, inter alia, (a) whether the trustees would bring suit against the delinquent operators; (b) whether the trustees would join the pensioners and/or active workers in a lawsuit against either or both the Union and delinquent coal operators; and (c) whether the trustees would furnish the pensioners' committee with a list of delinquent operators and the amounts owed by each. On September 1, 1964, the Welfare provisions of the Anthracite Wage Agreement were amended to specifically vest title in the trustees to monies owed the Fund and to otherwise conform to the provisions of the Labor-Management Relations Act of 1947. Brennan, however, was retained and designated "neutral" trustee. On December 9, 1964, the trustees filed a second action for delinquent royalties against Northwest Mining Company. In 1964, the Fund expended $10,684.15 for audits, $28,816.89 for legal services, and $670.00 for legal investigations.

On January 21, 1965, Bruno and Palermo commenced another action against the United Mine Workers Union in the United States District Court for the Middle District of Pennsylvania, asserting the same claim which had previously been asserted in the Eastern District and joining the trustees as involuntary plaintiffs. On March 30, 1965, this Court rendered its decision dismissing defense challenges in Honeybrook and sustaining jurisdiction under Section 301 of the Act. Commencing May 21, 1965, the trustees commenced eleven additional actions against delinquent operators during 1965, eighteen actions in 1966, four actions in 1967, and two additional actions in 1968. Among the 37 delinquent coal operators against whom actions were commenced by the trustees from 1964 through 1968, inclusive, 11 had been continually delinquent since 1954, 8 since 1959, and 11 became delinquent during the period 1960 through 1963, inclusive.

Beginning on September 2, 1965, members of the Committee, by their counsel, were permitted to intervene in 24 District Court actions which the trustees had instituted against delinquent operators. In these actions the trustees received cash payments of $1,370,913.76 in delinquent royalties and $6,031,524.66 [5] in the form of settlements, agreements, stipulations or judgments entered. In all the actions commenced since 1964, the trustees have recovered cash, as of July, 1970, in the amount of $1,535,160.-22 and settlements and judgments totaling $7,335,257.18.

## DISCUSSION

In my prior decision, I concluded that an award of counsel fees was justified only in exceptional cases where the applicant had created a common fund for the benefit of others. I reasoned further that even if the lawsuits against

---

4. Honeybrook claimed that its tonnage records had been destroyed in a fire and refused to allow the auditors to examine the records of Honeybrook's main sales agent, Glen Alden Sales Co., to determine the tonnage sold by Glen Alden for Honeybrook.

5. How much of this is collectible does not appear in the record.

the delinquent operators would not have been started had not the pensioned miners group brought their actions against the Union in the Eastern District and Middle District Federal Courts, this would still fall far short of the findings necessary to support a conclusion that the amounts recovered by the trustees were created by the efforts of Committee counsel. It was my judgment that the Fund realized herein was the result of the efforts of the trustees and their counsel who filed, pursued and, at least in the cases where funds were produced, successfully recovered the damages sought. The Court of Appeals, in a two to one decision disagreed. The majority held that this was a far too narrow view of the applicable rule. The issue, according to the majority, was whether the activities of the Committee and its counsel "helped to create a fund for the class for which it acted." The dissenting member disagreed with this definition of the issue and contended that any opinion that the Committee is "entitled to counsel fees simply for having 'helped' to create the recoveries for the Fund" would be a departure from existing case law and a wide expansion of the fund cases doctrine.[6] While describing the issue as aforesaid, viz., whether such activities "helped" to create a fund,[7] the majority opinion stated further:

> "We hold that committee activities *forced* the Fund trustees to commence the delinquency lawsuits, that these lawsuits produced the Fund and that the Committee's counsel fees and expenses incurred in bringing about the delinquency lawsuits are properly payable out of the Fund." (emphasis supplied)

Thus, the threshold problem for me is to determine whether the Court of Appeals has held that counsel fees are payable if

the Committee's activities "helped" create the Fund or whether it is necessary to show that such activities "forced" the trustees to sue and thereby produced the Fund. Counsel for the Committee asserts that ". . . it is implicit in the Third Circuit's holding allowing applicants to recover their counsel fees, that it is not necessary that applicants' efforts be the only factor that motivated the trustees [to file lawsuits against the delinquent operators], as long as those efforts were a substantial contributing factor." Applicants stress that "(n)owhere did the Third Circuit phrase its rule in terms of 'causing' or 'creating'." Trustees' counsel, on the other hand, argue that "(i)n order to prevail, the intervenors must convince the Court that they [forced the Trustees to commence their suits] and that the Trustees' suits would not have been brought but for the activities of the intervenors."

After considering both interpretations, I believe that counsel for the Committee has correctly stated the Court's holding and I will apply it accordingly.

Several facts in the chronology of events cannot be challenged. From 1959 until sometime in 1962, when Mr. Shea recommended that the trustees seek to amend the agreement to remove certain legal obstacles, the trustees did not file one lawsuit against a delinquent operator, although during this period the amount of delinquencies increased by more than 3 million dollars. Furthermore, even though this advice was tendered in 1962, there was no effort made to amend the Agreement for more than two years and Brennan, despite receiving the warning that his continued service as "neutral" trustee may violate § 302 of the Act, refused to resign until February, 1967. The failure to respond to this legal advice is significant because

---

6. I continue to share this view but, of course, I am required to follow the holding of the panel majority.

7. The majority opinion also noted that the Committee's suit against the Union ". . . was *instrumental* in prodding the cautious trustees into more aggressive action." (emphasis supplied)

of the Union's prominence in the actual operation of the Fund, inasmuch as two of the three trustees were officials of the Union. Therefore, it is fair to assume that the trustees could prevail upon the Union to seek an immediate amendment to the Agreement if the trustees and the Union were inclined to commence litigation. Their disinclination, consequently, can be attributed to their concern whether litigation might force some operators to close down, thereby affecting the employment of working miners and endangering the future of the Fund, and to a reluctance to resort to litigation as a solution to the problem. This latter conclusion is supported somewhat by the Union's move in 1962 to temporarily shut down certain operators rather than amend the Agreement in order to commence litigation. Unfortunately, Brennan's unwillingness to resign reveals that he was not about to accept the legal advice proffered. I believe Mr. Shea was anxious to have the Agreement amended and an acceptable neutral trustee appointed before litigation was initiated but the refusal of the trustees and the Union to respond accordingly indicates that they had no intention of resorting to Court action at that time. The activities of the Committee starting in 1961 and solidifying in 1962 with the retention of counsel could not have escaped the attention of the trustees and officials of the Union and caused them some concern. The requests of Committee counsel for the names of delinquent operators, for the amounts of delinquencies, for the institution of suits against such operators, and the threat of legal action must have intensified that concern. The suit against the Union in the Eastern District of Pennsylvania brought to public attention the claim that in excess of ten million dollars was owed the Fund and the two trustees who were officials of the Union could not have felt insulated or unaffected by the lawsuit commenced against the Union. However, the trustees, especially the two from the Union, remained determined and unyielding, if not stubborn, despite this attack.

In this regard, it must be remembered that the Committee first confronted the trustees in June, 1961, and when this course of action did not bear fruit, hired counsel in August of 1962. In September and October, 1962, counsel attempted to obtain information relative to the names of, and amounts owed by, delinquent operators. As early as November 1, 1962, counsel threatened the trustees with legal action if their demands were not met. Suit was started against the Union on March 11, 1963, and by letter dated July 30, 1963, counsel demanded that litigation be initiated for the collection of delinquent royalties and warned of the possibility of more actions against the Union. If these demands and threats, plus the other activities of the Committee and the pendency of the case against the Union, were enough to precipitate a change of attitude, the trustees should have been expected to commence litigation forthwith, but they did not. The record does not disclose any additional prodding of the trustees by the Committee during the remaining months of 1963 and, in fact, the action against the Union in the Eastern District was dismissed on December 11, 1963. Except for an appeal of this dismissal, the record does not reveal any further action or conduct directed toward the trustees prior to May 18, 1964, the date on which the trustees filed suit against Honeybrook. Consequently, when the Honeybrook action was started there was nothing of an imperative nature confronting the trustees; indeed, there had been a comparative lull in the campaign against them. This does not mean that the influence of the Committee or its counsel was not being felt; however, it was not of such magnitude and import to force, in itself, the decision of the trustees to sue Honeybrook at that time.

The resistance slowly softened, in my opinion, by a combination of factors in-

cluding the activities of the Committee and its counsel; the generally adverse reaction of the public to the conduct of the Fund, exemplified by the reduction in the amount of pensions; the discovery by audits of substantial cheating by operators in their tonnage reports to the Fund; the uncooperative attitude of Honeybrook and other operators toward Fund auditors; the desire to utilize discovery in order to ascertain the exact amount of delinquencies; and the recommendations by Shea to institute suit notwithstanding the failure of the trustees and the Union to act on his recommendations to conform the Fund. An action against Northwest Coal Co. was started in December of 1964 because Northwest abruptly ceased filing production reports and refused to pay even current royalties to the Fund. After § 301 jurisdiction was sustained by this Court on March 30, 1965, an issue which troubled Shea, numerous suits were filed against other delinquent operators. The litigation commencing in 1964 and continuing through 1968 bore little resemblance to the pro forma litigation of the 1955–1958 era, which appeared to be more of a warning to the operators rather than a determined effort to litigate to judgment. The post 1964 lawsuits entailed extensive auditing and pre-trial discovery and, as noted in my prior opinion, were pursued diligently, forcefully and effectively by the trustees and their counsel.

■ After carefully considering the evidence in light of my own long exposure to, and familiarity with, the numerous lawsuits in this district arising out of coal royalty problems, and conscientiously evaluating the credibility of the witnesses who testified, I conclude that the efforts of the Committee and its counsel were a substantial contributing factor to the institution of the legal ac-

tions which produced the fund previously referred to. Believing that this is the criterion mandated by the Court of Appeals, I find that the Committee is entitled to recover counsel fees and costs. I must point out, at the same time, that I feel other factors also motivated the trustees' decision to resort to court action and if the Committee had to establish that the trustees' suits would not have been brought but for their activities, I would have found against the Committee. I specifically refuse to find that without the Committee's activities the lawsuits *never* would have been started and the delinquencies *never* recovered. On the contrary, I believe the other factors hereinabove mentioned would have caused the trustees to institute suit. When this would have occurred is impossible to say.

The order of the Court of Appeals directed this Court to "make an award of counsel fees appropriate under the circumstances of the case, taking into account not only services rendered during the course of the delinquency lawsuits, but also services rendered in bringing about the change in the Fund trustees' approach." The trustees have offered no evidence challenging the extent of services provided by Bruno and Palermo or the amount sought therefor.[8] The evidence indicated that Palermo expended a minimum of 2,000 hours of his time in conferences with the Committee, with co-counsel, in performing investigative work, in legal research, court appearances in the District Court and Court of Appeals, correspondence, telephone calls, and general legal preparation. The evidence also indicated that Bruno, from the time of his retention by the Committee on August 15, 1962, until his death on May 23, 1968, expended at least 1500 hours of his time. Palermo, in view of his ability and experience and

---

8. Counsel for the Committee merely monitored the actions against the delinquent operators and played no real part except to sit in on conferences and to approve settlements. Consequently, the great bulk of their work was in the litigation against the Union and in their attempts to obtain information from the trustees and to stimulate them into action.

considering the locality in which he practiced, seeks payment of $35 to $50 per hour while Bruno, because of his greater experience and his metropolitan area practice, requests $75 to $100 per hour which, according to the evidence, was the prevailing rate in Philadelphia. Reimbursement of $3,076.61 is also sought for disbursements made by Bruno for filing fees, copying expenses, docket fees, and related expenses.

 After considering the time spent by counsel for the Committee, most of which was out of court and in a consultative and investigative capacity; the fact that the Fund has also paid counsel fees to its lawyers who actively prepared and proceeded with the litigation against the operators;[9] the fact that the fund was not created solely by their efforts; the fact that some of the time expended by Committee counsel was in a monitoring capacity and not as active counsel in the royalty lawsuits; the benefit conferred by their services; and the amount recovered, I conclude that counsel fees of $67,500 should be awarded to Mr. Bruno, $42,000 to Mr. Palermo, plus costs and expenses of $3,076.61. See Powell v. Pennsylvania Railroad Company, 267 F.2d 241 (3d Cir. 1959); Canon 12 of the Canons of Professional Ethics of the American Bar Association.

## CONCLUSIONS OF LAW

1. The activities of the Committee and its counsel were a substantial contributing factor to the institution of the legal actions which produced the fund of $1,535,160.22 in cash and settlements and judgments totaling $7,335,257.18.

2. The Committee is entitled to fair and reasonable compensation from the Fund for the legal services rendered by Committee counsel.

3. The fair and reasonable value of Palermo's services is $42,000.

4. The fair and reasonable value of Bruno's services is $67,500.

5. The Committee is entitled to reimbursement for necessary expenses incurred in the amount of $3,076.61.

9. In my prior opinion I made reference to the suit, still pending, in which the pensioned miners have charged the Union and Trustees with violations of their fiduciary duties. I felt that counsel fees could be realized from that action if plaintiffs were successful. The Court of Appeals stated, however, that this should not affect their entitlement here.