PUERTO RICO DEPARTMENT OF CONSUMER AF-
FAIRS ET AL. *v.* ISLA PETROLEUM CORP. ET AL.

No. 86–1406.   Argued February 29, 1988—Decided April 19, 1988

SCALIA, J., delivered the opinion of the Court, in which all other Members joined, except O'CONNOR, J., who took no part in the consideration or decision of the case.

*Lynn R. Coleman* argued the cause for petitioners. With him on the briefs were *Douglas G. Robinson, Matthew W. S. Estes, Dennis A. Simonpietri Monefeldt, Hector Rivera Cruz,* Secretary of Justice, and *Rafael Ortiz Carrion,* Solicitor General.

*John Harrison* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Cohen, Deputy Assistant Attorney General Spears, John F. Cordes,* and *Bruce G. Forrest.*

*Mark L. Evans* argued the cause for respondents. With him on the brief for respondents Esso Standard Oil Co. et al. were *Donald B. Craven, James P. Tuite,* and *Mario L. Paniagua. Rafael Pérez-Bachs, Néstor M. Méndez-Gómez, Ana Matilde Nin, Celso E. López, Igor Domínguez,* and *Alvaro R. Calderón, Jr.,* filed a brief for respondents Shell Co., Ltd., et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Robert Abrams,* Attorney General of New York, *O. Peter Sherwood,* Solicitor General, *Peter H. Schiff,* Deputy Solicitor General, and *Frank K. Walsh,* Assistant Attorney General, *Joseph I. Lieberman,* Attorney General of Connecticut, *James E. Tierney,* Attorney General of Maine, *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Michael F. Brockmeyer,* Assistant Attorney General, *Edwin Lloyd Pittman,* Attorney General of Mississippi, *W. Cary Edwards,* Attorney General of

JUSTICE SCALIA delivered the opinion of the Court.

In this case we must determine whether federal legislation providing for controls over the allocation and pricing of petroleum products, passed in response to the oil crisis of the early 1970's, or the legislation subsequently eliminating those controls, pre-empts gasoline price regulation by the Commonwealth of Puerto Rico.

I

In 1973, Congress passed the Emergency Petroleum Allocation Act (EPAA), Pub. L. 93–159, 87 Stat. 627, 15 U. S. C. § 751 et seq., in reaction to severe market disruptions caused by an embargo on oil exports to the United States. The central provision of the legislation, upon which all the rest depended, was § 4, 15 U. S. C. § 753, which required the President to promulgate regulations governing allocation and pricing of petroleum products. The Act also contained an express pre-emption provision, § 6(b), 15 U. S. C. § 755(b), precluding state and local regulation of allocation and pricing in conflict with a regulation or order under § 4.* As origi-

---

New Jersey, *Dave Frohnmayer,* Attorney General of Oregon, and *LeRoy S. Zimmerman,* Attorney General of Pennsylvania; and for the National Governors' Association et al. by *Benna Ruth Solomon* and *Amy Loeserman Klein.*

Briefs of *amici curiae* urging affirmance were filed for the American Petroleum Institute by *Arnold S. Block* and *G. William Frick;* for the New England Fuel Institute by *David Ginsburg, John H. Zentay, Gary J. Klein,* and *Ira T. Kasdan;* and for the Petroleum Marketers Association of America by *Peter L. de la Cruz.*

*Specifically, § 6(b), as codified, 15 U. S. C. § 755(b), read as follows:

"The regulation under [§ 4] of this title and any order issued thereunder shall preempt any provision of any program for the allocation of crude oil, residual fuel oil, or any refined petroleum product established by any State or local government if such provision is in conflict with such regulation or any such order."

This text permits the argument that the federal pre-emption excluded state and local price regulation only in connection with a state or local allocation program. That argument has not been made here, and would in any event only reinforce the conclusion that we reach. We shall assume, for

nally enacted, the EPAA provided for termination of the President's regulatory authority early in 1975, but during that year Congress provided for temporary extensions, and then enacted the Energy Policy and Conservation Act (EPCA), Pub. L. 94–163, 89 Stat. 871 (codified in scattered Titles and sections of United States Code), which amended the EPAA to provide for gradual decontrol. The EPCA extended the President's EPAA regulatory obligations for 40 months, and thereafter granted him discretionary regulatory authority until September 30, 1981; on that date, the statute prescribed that "[t]he authority to promulgate and amend any regulation or to issue any order under [the EPAA] shall expire." § 461, 89 Stat. 955, 15 U. S. C. § 760g.

Before enactment of the EPAA, Puerto Rico had regulated the prices of gasoline and other petroleum products sold in the Commonwealth. The Puerto Rico Department of Consumer Affairs (referred to in this litigation as DACO, apparently the acronym of its Spanish title, Departamento de Asuntos del Consumidor) was charged with regulating these and other commodities, but suspended its regulation of petroleum products when the EPAA was passed in 1973. In 1975, anticipating the expiration of the EPAA, DACO issued a regulation to restore its regulatory authority, but after the EPCA was passed it modified this regulation to make it effective only after federal price controls were lifted. Then in the spring of 1986 (4½ years after the President's regulatory authority was terminated), the Legislature of Puerto Rico imposed an excise tax on oil refiners, and DACO issued the regulations that are the subject of the challenge here. DACO Orders of March 26, April 23, and May 20, 1986 (App. to Pet. for Cert. 42a–45a, App. 7–12, 21–29). Among other requirements, these regulations prescribed that the Secretary of DACO be given 15 days' notice of price increases, pro-

---

purposes of our analysis, that the federal pre-emption of conflicting price regulation was complete.

hibited wholesalers from passing on the cost of the excise tax to retailers, and imposed maximum profit margins on sales by wholesalers to retailers.

Respondents, several oil companies, brought actions that were consolidated in the United States District Court for the District of Puerto Rico alleging, *inter alia*, that DACO's orders were unconstitutional on pre-emption grounds, and requesting declaratory and injunctive relief. The District Court enjoined DACO from enforcing its regulations, in part on the grounds that DACO's authority was pre-empted by Congress' decision to decontrol petroleum prices, and petitioners appealed this determination to the Temporary Emergency Court of Appeals (TECA). (Petitioners also challenged certain other aspects of the District Court's decision in an appeal to the United States Court of Appeals for the First Circuit, which has stayed its proceedings.) A divided panel of the TECA affirmed. 811 F. 2d 1511 (1986). Because of the importance of the issue presented, we granted the petition for certiorari. 484 U. S. 814 (1987).

## II

Although Puerto Rico has a unique status in our federal system, see, *e. g.*, *Examining Board* v. *Flores de Otero*, 426 U. S. 572, 596 (1976), the parties have assumed, and we agree, that the test for federal pre-emption of the law of Puerto Rico at issue here is the same as the test under the Supremacy Clause, U. S. Const., Art. VI, cl. 2, for pre-emption of the law of a State. See 48 U. S. C. § 734 (statutory laws of the United States generally "have the same force and effect in Puerto Rico as in the United States"); Helfeld, How Much of the United States Constitution and Statutes Are Applicable to the Commonwealth of Puerto Rico?, 110 F. R. D. 452, 469 (1985) (Supremacy Clause applies to Puerto Rico). Cf. *Examining Board, supra*, at 597; *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 675 (1974). Our Supremacy Clause cases typically involve analysis of the

scope of pre-emptive intent underlying statutory provisions that impose federal regulation. See, *e. g., Louisiana Public Service Comm'n* v. *FCC*, 476 U. S. 355, 368–370 (1986); *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 95–96 (1983); *Hines* v. *Davidowitz*, 312 U. S. 52, 67, 69–70 (1941). While the EPAA was operative, that typical question posed relatively little difficulty, since § 6(b) explicitly pre-empted state regulation "in conflict" with an EPAA regulation or order. Here, however, we are presented with the decidedly untypical claim that federal pre-emption exists despite, not only the absence of a statutory provision specifically announcing it, but the absence of any extant federal regulatory program with which the state regulation might conflict and which might therefore be thought to imply pre-emption. Respondents' contention, in a nutshell, is that the EPAA evinced a federal intent to enter the field of petroleum allocation and price regulation, and that the EPCA never countermanded that intent, but merely changed the nature of the federally imposed regime from one of federal hands-on regulation to one of federally mandated free-market control.

We have suggested elsewhere that the Constitution permits congressional creation of such a regime. See, *e. g., Arkansas Electric Cooperative Corp.* v. *Arkansas Public Service Comm'n*, 461 U. S. 375, 384 (1983). But to say that it can be created is not to say it can be created subtly. As we have repeatedly stated, "'"we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."'" *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 715 (1985), quoting *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977), in turn quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). We do not find that clarity and manifestness in the statutory scheme respondents rely upon here, which consists of no more than (1) provisions for detailed Presidential regulation, which remain in the current

version of the United States Code, but whose effect has, by subsequent statute, specifically been decreed to expire, and (2) a provision pre-empting state laws that conflict with any Presidential regulation or order under this expired authority.

In the last analysis, what respondents rely upon consists of nothing more than excerpts from the legislative history of the EPCA which in their view (though not in the view of petitioners) evidence a congressional intent that there be a free market in petroleum products. While we have frequently said that pre-emption analysis requires ascertaining congressional intent, see, *e. g.*, *Louisiana Public Service Comm'n, supra*, at 369, we have never meant that to signify congressional intent in a vacuum, unrelated to the giving of meaning to an enacted statutory text. There is no text here—neither § 6(b), which only pre-empts conflicts with actual federal regulation, nor any extant federal regulation that might plausibly be thought to imply exclusivity—to which expressions of pre-emptive intent in legislative history might attach. Respondents have brought to our attention statements that may reflect general congressional approval of a free market in petroleum products, or general congressional belief that such a market would result from enactment of the EPCA, or even general congressional desire that it result. But unenacted approvals, beliefs, and desires are not laws. Without a text that can, in light of those statements, plausibly be interpreted as *prescribing* federal pre-emption it is impossible to find that a free market was mandated by federal law.

Today's conclusion that the DACO regulations are not pre-empted was plainly foreshadowed by our decision in *Tully* v. *Mobil Oil Corp.*, 455 U. S. 245 (1982) *(per curiam).* In that case, the TECA had held that the EPAA pre-empted a state provision barring oil companies from passing on to subsequent purchasers the cost of the State's gross-receipts tax. Since, by the time we decided that appeal, the EPCA-imposed expiration date for Presidential authority under the EPAA had already passed, we vacated the judgment, agree-

ing with the TECA's own determination that expiration of the EPAA "'will signal the end of federal concern in this area.'" *Id.*, at 246, quoting 653 F. 2d 497, 502 (1981). Our action was based on the theory that the pre-empting legislation was no more. 455 U. S., at 247, and n. 2.

Instead of following our decision in *Tully*, the TECA relied on language in our subsequent decision in *Transcontinental Pipe Line Corp.* v. *State Oil and Gas Bd. of Miss.*, 474 U. S. 409 (1986), apparently finding there a modification of our pre-emption doctrine. In *Transcontinental*, we returned to an issue we had previously considered in *Northern Natural Gas Co.* v. *State Corporation Comm'n of Kansas*, 372 U. S. 84 (1963): whether a state regulation requiring a pipeline company to purchase gas ratably from owners with common interests in a gas source was pre-empted by federal legislation. The affirmative answer in *Northern Natural* had been based on the Court's construction of the Natural Gas Act (NGA), 15 U. S. C. § 717 *et seq.* In *Transcontinental*, the question presented was whether the Natural Gas Policy Act of 1978 (NGPA), 15 U. S. C. § 3301 *et seq.*, "altered those characteristics of the federal regulatory scheme which provided the basis in *Northern Natural* for a finding of pre-emption." 474 U. S., at 417. The strongest evidence of such alteration was the NGPA's withdrawal of the type of gas purchases at issue in *Transcontinental* from the jurisdiction of the Federal Energy Regulatory Commission (FERC). We concluded, however, that the pre-emptive force of the NGA recognized in *Northern Natural* was equalled by the pre-emptive force of the NGPA, because the NGPA did not alter the comprehensive nature of the scheme, *id.*, at 420–421, and did not eliminate the federal interest in consumer protection, *id.*, at 423–424.

At one point in our *Transcontinental* opinion, we phrased the question as "whether Congress, in revising a comprehensive federal regulatory scheme to give market forces a more significant role in determining the supply, the demand, and

the price of natural gas, intended to give the States the power it had denied FERC." *Id.*, at 422. In the decision below, the TECA apparently interpreted this as the enunciation of a new pre-emption test, and proceeded to search the legislative history of the EPCA for evidence of an affirmative intention that the States assume the price-regulating role that the Federal Government was abandoning. Finding none, and further finding the expression of congressional sentiments favoring the free market, it concluded that the States were pre-empted. This mistook our intent. *Transcontinental* was not meant to announce a new rule of burden-shifting whenever the Federal Government terminates or reduces its regulation of a field of commerce, replacing the normal need for finding a federal intent to pre-empt with a need to find a federal intent to retransfer authority to the States. To the contrary, a "clear and manifest purpose" of pre-emption is always required. We demanded an affirmative intent to retransfer authority in *Transcontinental* because only that could have refuted the pre-emptive intent already manifest in the revised, but nonetheless "comprehensive," federal regulatory scheme.

Respondents would draw exaggerated inferences from another statement in *Transcontinental*, to the effect that "'[a] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate.'" *Ibid.*, quoting *Arkansas Electric Cooperative Corp.*, 461 U. S., at 384. That was obviously not meant in an unqualified sense; otherwise, deliberate federal inaction could always imply pre-emption, which cannot be. There is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it. Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, *then* the pre-emptive inference can be drawn—not from federal inaction alone, but from inaction joined with action.

That is not what we have here. Congress has withdrawn from all substantial involvement in petroleum allocation and price regulation. There being no extant action that can create an inference of pre-emption in an unregulated segment of an otherwise regulated field, pre-emption, if it is intended, must be explicitly stated. To adopt the imaginative analogy set forth in the Solicitor General's *amicus* brief, repeal of EPAA regulation did not leave behind a pre-emptive grin without a statutory cat.

For the reasons stated, the judgment of the TECA is

*Reversed.*

JUSTICE O'CONNOR took no part in the consideration or decision of this case.