7 F.3d 618
 126 Lab.Cas. P 10,908, 27 Fed.R.Serv.3d
760, 8 IER Cases 1505
 Myrna JURCEV, Stanley Miller, Florence Moore, Rosemary
Riordan, and Dr. Cosette Z. Villanueva,
Plaintiffs-Appellants,
v.
CENTRAL COMMUNITY HOSPITAL, an Illinois not-for-profit
corporation, and The Prairie Foundation, formerly
Central Community Foundation, an
Illinois not-for-profit
corporation,
Defendants-
Appellees.
 Nos. 92-1927, 92-2379.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 18, 1993.
Decided Oct. 14, 1993.
 
 David J. Stetler (argued), McDermott, Will & Emery, Chicago, IL, Joseph D. Keenan, III, Sklodowski, Franklin, Puchalski & Reimer, Chicago, IL, for plaintiffs-appellants.
 John A. Dienner, III (argued), Lydon & Griffin, Chicago, IL, for defendants-appellees.
 Before COFFEY and ROVNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 COFFEY, Circuit Judge.
 
 
 1
 The Worker Adjustment and Retraining Notification Act ("WARN" Act) requires some employers of 100 or more full-time employees to give at least sixty days' advance written notice of plant closings and mass layoffs to affected employees. See 29 U.S.C. § 2102(a) (1988).[1] On February 26, 1990, the Board of Trustees of Central Community Hospital (the "Hospital") voted to close the Hospital on March 14, 1990, and gave the employees written notice of its decision that same day. A class of employees who lost their jobs when the Hospital closed brought an action against the Hospital, Central Community Foundation (the "Foundation"), which was the not-for-profit corporation that managed the Hospital's financial affairs, and the Foundation's successor, The Prairie Foundation. The class alleged that: (1) the defendants violated the WARN Act by failing to notify employees that the Hospital would be closing at least sixty days in advance of its scheduled closing on March 14, 1990; and (2) the defendants breached an agreement in the Hospital's employee policy manual and violated the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 et seq. (1993), by refusing to pay employees for accumulated sick leave. The district court granted summary judgment in favor of the defendants on the WARN Act claim, ruling that the defendants were not required to give the employees the full sixty days' notice that the Hospital would be closing because the closing was necessitated by business circumstances that were not reasonably foreseeable. See 29 U.S.C. § 2102(b)(2)(A). The court thereafter dismissed the state law claims for lack of subject-matter jurisdiction. The class filed a notice of appeal from the denial of its motion for summary judgment, the grant of the Hospital's motion for summary judgment, as well as certain interlocutory discovery rulings. The district court subsequently ordered the class to pay the Hospital's costs, a sum of $2,314.75. The class appealed from that order. By order dated June 10, 1992, we consolidated the appeals. We affirm the summary judgment and the award of costs.
 
 I. BACKGROUND
 A. Facts
 
 2
 The Hospital was an Illinois not-for-profit corporation that was exempt from federal income taxes pursuant to 26 U.S.C. § 501(c)(3) (1988). The Foundation, also an Illinois not-for-profit corporation, was incorporated in December of 1983 to serve as a "support foundation" for the Hospital's benefit pursuant to 26 U.S.C. § 509(a)(3) (1988). The Hospital's Board of Trustees appointed the Foundation's Board of Trustees.[2] The Foundation's articles of incorporation expressly empowered the Foundation "to receive gifts, devises, bequests and contributions in any form, and to use, apply, invest and reinvest the principal and/or income therefrom or distribute the same" for the benefit of and to carry out the purposes of the Hospital. In its application for exemption from federal income taxes the Foundation advised the Internal Revenue Service that it proposed to establish an endowment fund with all of the monies received and to use the income generated from the fund to support the Hospital. In December of 1984 the Internal Revenue Service issued a letter stating that the Foundation was exempt from federal income tax "based upon information supplied and assuming [its] operations will be as stated in [its] application." The Board of Trustees of the Hospital thereafter transferred the Hospital's entire investment portfolio (assets in excess of 19 million dollars) to the Foundation. Between November 4, 1985, and January 22, 1990, the Foundation made a total of $11,950,000 in unrestricted subventions to the Hospital. The Hospital's financial condition was in such grave condition that the Hospital depended on the Foundation's subventions to cover its losses and remain open.
 
 
 3
 After the January 22, 1990, subvention the Foundation's president, Sherwin Stone, requested that the Hospital's comptroller prepare a list of all subventions paid to date. When Stone received the report he learned that the Foundation's subventions to the Hospital were in excess of the Foundation's earnings and thus had invaded principal. Stone relayed the information to the Hospital's administrator on February 19, 1990, and a meeting of the Hospital's Board of Trustees was convened shortly thereafter. During this meeting Stone advised the Board that the question whether the invasions of the principal would impair the Foundation's tax-exempt status and other legal issues were being researched, and that he would report back to the Board as soon as he had an answer. He further informed the Board that, in light of the uncertain legality of the Foundation's invasion of principal, the Foundation might very well be precluded from making further subventions in excess of income until past invasions of principal were repaid.
 
 
 4
 Stone subsequently discussed the legal issues with the other attorneys in his firm and the tax issues with the accounting firm that represented both the Hospital and the Foundation. The attorneys provided Stone with a written memorandum of law which concluded that further subventions in excess of income might very well jeopardize the tax-exempt status of the Foundation and expose the individual members of the Foundation's Board of Trustees to liability for breach of their fiduciary duties. The memorandum recommended that no further subventions be made until a ruling was obtained from the Internal Revenue Service permitting or prohibiting further invasions of principal, a process that might conceivably require a number of months. After a series of conversations with Stone, the tax consultant agreed with the conclusions the attorneys reached.
 
 
 5
 The Foundation's Board of Trustees met on the morning of February 26, 1990, and Stone reported to the Board what the attorneys and accountants had advised. The Board voted to cease making subventions to the Hospital until the Hospital repaid the invasions of the principal, or the Foundation earned sufficient monies to offset the invasions, or the Foundation received a ruling from the Internal Revenue Service permitting the payment of principal to the Hospital. That afternoon the Hospital's Board of Trustees convened, and Stone apprised them of the situation. Stone included in his briefing to the Hospital's Board the Foundation's resolution to halt further subventions unless one of the three conditions set forth by the Foundation's Board was met. The Board debated the alternatives and heard from the Hospital's administrator who projected that, based on its current cash receipts, the Hospital could remain open only for approximately two more weeks. The Board, faced with the Foundation's ultimatum and the administrator's report, voted to close the Hospital effective March 14, 1990, and immediately began to notify employees of the impending closure.
 
 
 6
 Later on February 26 the Hospital's departmental heads met. The departmental heads were apprised of the Hospital's dire financial condition and were given written copies of a letter from the Hospital's administrator announcing the closure of the Hospital effective March 14, 1990, and explaining the necessity of the early date of closure. The departmental heads were instructed to return to their departments and tell their employees of the closure. Copies of the letter were posted throughout the Hospital. The closure was publicly announced on February 26 and news stories appeared in the media the following day. The Hospital also gave each employee a copy of the letter in the envelope containing his March 8, 1990, paycheck. The Hospital closed on March 14, 1990, as scheduled.
 
 B. Proceedings in the District Court
 
 7
 The class filed a complaint in the United States District Court for the Northern District of Illinois on March 28, 1990, in which it named the Hospital as the sole defendant. It alleged that the Hospital had violated 29 U.S.C. § 2102(a), by failing to give its employees sixty days' advance notice that it was closing.[3] The Hospital conceded that it had not given its employees the sixty-days' advance notice of closure but claimed that it was not required to do so because the closure was caused by the Foundation's decision to discontinue making subventions to the Hospital, and this decision was "not reasonably foreseeable at the time the notice would have been required." 29 U.S.C. § 2102(b)(2)(A). The class sought to discover, among other things, documents relating to the number of patients that the Hospital admitted from 1986 to 1990 and the Hospital's income and liabilities during that period of time, as well as documents relating to the financial condition of the Hospital after February 28, 1990. In October of 1990 the court issued a protective order restricting disclosure to the public of confidential documents relating to the Hospital's income, liabilities, and admissions. (The court subsequently amended the protective order on November 2, 1990, and again on March 20, 1992.) In a February 1, 1991, ruling the court denied discovery of the post-closure financial documents.
 
 
 8
 The Hospital moved for summary judgment in June of 1991. Before the motion was decided, the class obtained leave to amend its complaint and added the Foundation as a defendant. The district court ordered that an answer not be filed pending disposition of the motion for summary judgment. The class never served the Foundation with process and, as such, the Foundation did not file an appearance or pleading or participate in the defense of the case. The class subsequently filed a cross-motion for summary judgment. On March 5, 1992, the district court granted the Hospital's motion for summary judgment, denied the class' motion for summary judgment, and dismissed the state law claims for lack of subject-matter jurisdiction. The court concluded that based upon the record before it the Hospital was not required to give its employees sixty-days' advance notice that the Hospital was closing because: (1) the Hospital's loss of subventions from the Foundation was a "business circumstance" that "caused" the Hospital to close within the meaning of 29 U.S.C. § 2102(b)(2)(A); (2) the Foundation did not receive definitive advice that further subventions might be improper until February 26, 1990; (3) the Hospital's Board of Trustees did not have advance notice that the subventions might be improper; and (4) the undisputed facts established that on January 14, 1990, sixty days before the Hospital closed, the Hospital could not have reasonably foreseen that the Foundation would cease making subventions. The court entered judgment in favor of the Hospital on March 6, 1992. On March 20, 1992, the court modified the judgment to include the dismissal of the amended complaint against the Foundation. Finally, on May 15, 1992, the district court awarded the Hospital $2,314.75 in costs to be assessed against those members of the class named in the complaint.
 
 II. ISSUES
 
 9
 We are called upon to resolve four issues. The first two involve the district court's finding in the summary judgment proceeding that 29 U.S.C. § 2102(b)(2)(A), excused the Hospital from the requirement of giving its employees sixty days' advance notice prior to closing: whether the district court properly concluded that the Foundation's decision to cease making subventions to the Hospital caused the Hospital to close, and whether the district court committed error in finding that the Foundation's decision to cease making subventions to the Hospital was not reasonably foreseeable on January 14, 1990, sixty days before the Hospital closed. The third issue is whether the district court's rulings limiting the scope of discovery constituted an abuse of its discretion. Finally, the fourth issue is whether the district court abused its discretion in assessing costs only against those members of the class named in the complaint rather than against all members of the class. We consider these issues in turn.
 
 III. DISCUSSION
 A. 29 U.S.C. § 2102(b)(2)(A)
 
 10
 As a preliminary matter we address the parties' disagreement on the proper standard of review of the district court's grant of summary judgment in favor of the Hospital. The class submits that we should review the judgment de novo; the Hospital counters that our review should be under the clear error standard. Generally we review grants or denials of summary judgment de novo. Carston v. The County of Cook, 962 F.2d 749, 751 (7th Cir.1992); Pro-Eco, Inc. v. Board of Comm'rs, 956 F.2d 635, 637 (7th Cir.1992). Nevertheless, recent decisions of this court have held that where the grant of summary judgment merely entails the application of a legal standard to undisputed facts, and the party opposing summary judgment does not claim a right to a jury trial, we review the summary judgment for clear error. See Central States, Southeast and Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1373 (7th Cir.1992) ("The application of a legal standard to undisputed facts is classified as a fact for purposes of delimiting the respective spheres of trial and appellate court.... We defer to the fact finder's application just as we do his findings with regard to the facts to which to apply the standard. In either case the appellate standard is clear error."); accord Central States Pension Fund v. Personnel, Inc., 974 F.2d 789, 792 (7th Cir.1992); St. Mary's Medical v. Disco Alum. Prods., 969 F.2d 585, 588-89 (7th Cir.1992). We recognize that the introduction of the clearly erroneous standard of review to summary judgment cases has thus far been limited to cases in which (1) the facts are undisputed, (2) the trial court is merely applying the law to the facts, and (3) the nonmoving party has made no request for a jury trial. While this new standard causes us some concern, we need not resolve any conflict between the competing standards in this case because the class cannot prevail under either de novo or clearly erroneous review.
 
 
 11
 The questions resolved by the district court, whether the Foundation's decision to cease making subventions to the Hospital and whether the Hospital's Board of Trustees had advance notice of the Foundation's decision, were applications of the legal standard set forth in 29 U.S.C. § 2102(b)(2)(A) ("closing or mass layoff caused by business circumstances that were not reasonably foreseeable"). The question before us is whether based on undisputed facts the Hospital was entitled to judgment as a matter of law. Before the district court, both the class and the Hospital claimed a right to judgment as a matter of law. On appeal, the class maintains that there are disputed issues of fact. Thus as we avoid resolving any alleged factual disputes in this appeal from a grant of summary judgment, we "view the record and all inferences drawn from it in the light most favorable to" the class. Carston, 962 F.2d at 751. We therefore determine whether there is any " 'genuine issue as to any material fact' " and whether the Hospital " 'is entitled to judgment as a matter of law.' " Id. (quoting Fed.R.Civ.P. 56(c)); see Preze v. Board of Trustees, Pipefitters Welfare Fund Local 597, 5 F.3d 272 (7th Cir. 1993) (applying de novo review to a grant of summary judgment on undisputed facts).
 
 1. Causation
 
 12
 On February 26, 1990, the Foundation's Board of Trustees voted to cease making any more subventions to the Hospital because the prior subventions had invaded the principal of the endowment fund and the Board had been advised by its attorneys as well as its accountants that invading the principal might cause the Foundation to lose its tax-exempt status and might be deemed a wasting of the Foundation's assets. Later that same day the Hospital's Board voted to close the Hospital effective March 14, 1990, based upon the Foundation's decision to cease making subventions. Thus the decision to cease making subventions to the Hospital at least in one sense "caused" the Hospital's Board of Trustees to vote to close the Hospital. The class argues that the Foundation's decision to cease making subventions did not "cause" the Hospital to close on March 14, 1990, as that term is used in 29 U.S.C. § 2102(b)(2)(A), because the Hospital's Board of Trustees should have realized the Foundation's conclusion that it could not invade the principal of the endowment fund to make the subventions was based on erroneous legal and tax advice and, as such, the Hospital's Board should not have "blindly accepted" the Foundation's decision. Instead of accepting the Foundation's conclusion that it could not invade principal to make subventions, the class argues, the Hospital's Board should have challenged the authority of the Foundation to cease making subventions because the Foundation's articles of incorporation permitted the invasion of principal for subventions. This argument is premised on the faulty assumption that the Hospital's Board controlled the Foundation and thus could have forced the Foundation to continue making subventions. We agree with the district court that the Hospital did not have control over the Foundation. True, all four members of the Foundation's Board also were members of the Hospital's Board. But it is clear that each member of the Foundation's Board owed an independent fiduciary duty to the Foundation. Moreover, because the Hospital's Board had a total of nine members, the four did not comprise a majority of the Hospital's Board. The Hospital's sole power over the Foundation's Board was to appoint all of its members each year. The Hospital had no power to remove or suspend a member of the Foundation's Board, or to veto the Board's decisions.
 
 
 13
 The class likens the relationship between the Hospital and the Foundation to one between a parent company and a wholly-owned subsidiary. It points out that the Foundation's books and financial records were housed at the Hospital and maintained by the Hospital's comptroller and that the Foundation had no site or mailing address separate and distinct from the Hospital. It notes that, to maintain its tax-exempt status the Foundation had to be "operated, supervised, or controlled by" the Hospital. 26 U.S.C. § 509(a)(3)(A-C) (1988); 26 C.F.R. § 1.509(a)-4(g) (1993). Yet it is clear from the Foundation's application for tax-exempt status filed with the Internal Revenue Service that the Hospital's control over the Foundation did not enable it to mandate that the Foundation continue to make subventions from the endowment fund:
 
 
 14
 [Question on the Application] To what extent does the supported organization have a significant voice in your investment policies, the making and timing of grants, and in otherwise directing the use of your income or assets?
 
 
 15
 [Foundation's Answer] The supported organization has no direct voice over the Foundation's investment policies, grants or use of income, except through its right to appoint the Trustees of the Foundation annually.
 
 
 16
 The Internal Revenue Service granted the Foundation tax-exempt status "assuming [the Foundation's] operations will be as stated in [the] application for recognition of exemption."
 
 
 17
 The class also refers us to 20 C.F.R. § 639.3(a)(2) (1992), which lists factors for determining whether "independent contractors and subsidiaries which are wholly or partially owned by a parent company" are to be treated as separate employers or as a part of the parent. It argues that application of the factors to the relationship between the Hospital and the Foundation compel a finding that the Foundation and the Hospital must be treated as a single entity. Nevertheless, 20 C.F.R. § 639.3(2) is of little help to the class because it begs the question in the action before us, whether the Hospital controlled the Foundation: one of the listed factors is whether the parent company exercises control over the subsidiary.
 
 
 18
 The class further argues that the cessation of subventions did not "cause" the Hospital to close because the Hospital had sufficient funds to stay open for sixty days even without the subventions. It submits that the WARN Act required the Hospital to demonstrate both an unforeseeable circumstance that forced its closure and that its closure could not be delayed for sixty days from February 26, 1990. The district judge disagreed, stating that "the WARN Act does not in my view require the Hospital to search for ways to stay open when confronted with a complete loss of its principal source of income." While the court's finding that the subventions were the Hospital's principal source of income appears to be incorrect (the Hospital had gross operating revenues of over $20 million in 1989), there is no dispute that the Hospital depended on the subventions to remain afloat: from 1985 to 1990 the Hospital operated at a loss of about three million dollars per year. Yet we need not conduct a detailed analysis of the Hospital's balance sheet to conclude that because the Hospital did not show that it had insufficient assets to remain open for sixty days from February 26, 1990, it could not rely on the "unforeseen business circumstances" exception. Neither the WARN Act nor its accompanying regulations saddle an employer with the burden of making such a showing. The regulations state that the employer bears the burden of demonstrating that the conditions for the exception have been met, but neither the regulations nor the WARN Act articulate as one of the conditions that the employer be able to demonstrate that it has insufficient assets to remain open for sixty days. Furthermore, the only federal court that has considered the issue has found that an unforeseen business circumstance can be sufficient cause for a plant to close if the plant can no longer operate profitably. See Jones v. Kayser-Rose Hosiery, Inc., 748 F.Supp. 1276, 1286 (E.D.Tenn.1990). Here, the Hospital's comptroller estimated that had the Hospital remained open without the Foundation's funding the Hospital would have had a negative cash balance of over $300,000 by March 22, 1990, only eight days after the Hospital closed.
 
 
 19
 The class purports to find support for its position in the legislative history of the WARN Act. A House of Representatives Conference Report states that the "unforeseeable business circumstances" exception should apply only where "it is not economically feasible to require the employer to give notice and wait until the end of the notice period before effecting the plant closing or mass layoff." H.R.Rep. No. 100-576, 100th Cong., 2nd Sess., 1049 (Apr. 20, 1988), reprinted in 1988 U.S.C.C.A.N. 1547, 2082. The class submits that it is "economically feasible" for an employer to stay open or pay its employees for sixty days if it can come up with enough money to do so by selling its assets and deferring its payables. Legislative history may on occasion be useful in interpreting ambiguous language, but the class has not been able to come forward with any ambiguous language in the WARN Act that this statement might help decode. See Lincoln v. Vigil, --- U.S. ----, ---- - ----, 113 S.Ct. 2024, 2031-32, 124 L.Ed.2d 101 (1993) (legislative history divorced from statutory text has no significance); Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 501, 108 S.Ct. 1350, 1354, 99 L.Ed.2d 582 (1988) (same). Thus the legislative history cited by the class is of no significance. The WARN Act fails to support the class' position. We therefore agree with the conclusion of the district court that the Hospital was not required to establish that it had insufficient assets to remain open for sixty days after February 26, 1990.
 
 
 20
 In sum, we agree with the district court that the Foundation's decision to cease making subventions to the Hospital "caused" the Hospital to close on March 14, 1990, within the meaning of 29 U.S.C. § 2102(b)(2)(A). The Hospital did not control the Foundation and, as such, was in no position to compel the Foundation to continue making subventions. Moreover, the WARN Act did not compel the Hospital to demonstrate that it had insufficient assets to remain open for sixty days after the Foundation decided to cease making subventions. We now turn to the question whether the Foundation's decision was not reasonably foreseeable.
 
 2. Foreseeability
 
 21
 Even if the Foundation's decision to discontinue making subventions to the Hospital caused the Hospital to close, the Hospital was not excused from complying with the WARN Act's requirement that it give its employees sixty days' advance notice of its closing unless the Foundation's decision was "not reasonably foreseeable" on January 14, 1990, the date on which notice of the closure would have been required. See 29 U.S.C. § 2101(b)(2)(A). "An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1) (1992). We have previously in this opinion expressed our agreement with the district court's conclusion that the Foundation's decision to discontinue making subventions was beyond the control of the Hospital. The class contends that the district court erroneously ruled that the Foundation's decision was sudden, dramatic, and unexpected.
 
 
 22
 We disagree with the class. Seven members of the Hospital's Board of Trustees testified during their depositions that they did not know of the Foundation's decision to discontinue making subventions until February 26, 1990, (the class did not depose the other two members of the Hospital's Board). And it was not until late February of 1990 that anyone on either Board became aware that dipping into principal to make the subventions might have violated the terms of the Internal Revenue Service's grant of tax-exempt status to the Foundation. The class submits that the Foundation's decision to discontinue making subventions was neither sudden, dramatic, nor unexpected because the Board had long been aware of the events that ultimately led to the Foundation's decision. According to the class, the Hospital's Board should have been aware that the Foundation would stop making subventions when the Board decided to transfer its entire investment portfolio to the Foundation and thereby become financially dependent on the Foundation. The class argues that some disruption in funding from the Foundation was reasonably foreseeable. The class also claims that well before January 14, 1990, the Hospital should have known from the audited financial statements of the Hospital and the Foundation that the Foundation would stop making subventions. These statements demonstrated that the Hospital was operating at a substantial loss and that, as of October 18, 1989, the Hospital received its subventions from the principal of the endowment fund.
 
 
 23
 The Hospital Board's awareness of these circumstances did not render the Foundation's February 26, 1990, decision to stop making subventions reasonably foreseeable. The financial statements of the Foundation and the Hospital that would have alerted the Hospital's Board to the fact that the Foundation was dipping into principal to make subventions to the Hospital were not available to the Board until well after January 14, 1990. The financial statements were not generated daily, but annually, at the end of each fiscal year. The fiscal year ran from July 1 to June 30. The first subvention that invaded principal was made on October 18, 1989, and the second and final subvention that invaded principal was made on January 22, 1990. The statement that reflected those two subventions was prepared in June of 1990 at the earliest, which was three months after the Hospital closed. True, the Hospital's comptroller, who maintained both the Hospital's and the Foundation's financial records, was aware of the invasion of principal from the inception of the practice. But he never told anyone because he was under the impression that it was alright to invade principal. Because he thought that it was proper for the Foundation to use any monies in the endowment fund for the subventions, including principal, he did not expect the Foundation to decide to stop making subventions because of the invasions of principal.
 
 
 24
 Likewise, the class' contention that the Hospital should have known that the Foundation would discontinue making subventions because the Hospital had elected to become dependent on the Foundation for financial support is without merit. "The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." 20 C.F.R. § 639.9(b)(2) (1992). The class fails to make a persuasive argument that the Hospital's decision to transfer its investment portfolio to the Foundation can be characterized as an exercise of unreasonable business judgment. The most that the class can show is that, in retrospect, the decision to become financially dependent on the Foundation might have been unwise. That is a far cry from showing that the decision was so unreasonable that it rendered the Foundation's decision to cease making subventions six years later foreseeable.
 
 
 25
 In sum, the district court properly ruled that the Foundation's February 26, 1990, decision to cease making subventions to the Hospital was not reasonably foreseeable on January 14, 1990. We agree with the district court's conclusion that the Foundation's decision was sudden, dramatic, and unexpected because no one on the Hospital's Board knew or had reason to know until February of 1990 that the Foundation had invaded principal in making subventions to the Hospital or that the invasions of principal might have jeopardized the Foundation's tax-exempt status, and no one on the Hospital's Board knew or should have known until February 26, 1990, that the Foundation would cease making subventions.
 
 B. Discovery Rulings
 
 26
 The class contends that the district court improperly refused to compel the Hospital to respond to certain interrogatories and to produce certain documents. Specifically, the class claims that it was unjustly denied information about: (1) reasons for the Hospital's closure other than the one proffered by the Hospital; (2) loans that the Hospital made to Franklin Community Hospital; and (3) the post-closure financial condition of the Hospital. "District courts have broad discretion in matters related to discovery.... On review, courts of appeal will only reverse a decision of a district court relating to discovery upon a clear showing of an abuse of discretion." Dole v. Local 1942, IBEW, AFL-CIO, 870 F.2d 368, 371 (7th Cir.1989) (citations omitted). We will not disturb a trial judge's exercise of discretion unless it is established that the denial of the requested discovery "would result in actual and substantial prejudice to the complaining litigant." Otis Clapp & Son, Inc. v. Filmore Vitamin Co., 754 F.2d 738, 744 (7th Cir.1985).
 
 
 27
 The district court's discovery rulings did not actually and substantially prejudice the class. First, the class was permitted discovery of the question why the Hospital closed and the role the Hospital's loan to Franklin Community Hospital played in the closure. In September of 1990 the district court directed the class to depose the Hospital's Trustees as a first step in the discovery process. By February 1, 1991, the class had not yet deposed the Trustees because it claimed that, without certain financial statements and records of the Hospital's admission of patients, it could not inquire into possible reasons why the Trustees voted to close the Hospital. The court again directed the class to depose the Hospital's Trustees to learn what facts the Trustees had before them when they voted to close the Hospital:
 
 
 28
 Do your discovery. Do your depositions of the people of the foundation and people at the hospital. You are entitled to have what they had before them when they made their decision, which is whatever audit or financial statements they had.
 
 
 29
 * * * * * *
 
 
 30
 Ask them first. And you have got the position of the other side, which is that they're going to rely on the Central Community Foundation refusing to give them money. And that's really the only issue.
 
 
 31
 * * * * * *
 
 
 32
 If that's not the reason, if it's an incredible assertion, if after you have done this deposition, you see holes in their story, fine.
 
 
 33
 * * * * * *
 
 
 34
 Depose the people, hear what they have to say, and then come in and talk to me about what it is.
 
 
 35
 R.O.A. 45, at 11-12, 15-16 (Transcript of Feb. 1, 1991, motion to compel discovery).
 
 
 36
 Near the end of the hearing class counsel clarified what he intended to ask the Hospital's Trustees:
 
 
 37
 In a deposition I would ask [the Hospital's Trustees] what were the patient admissions? Were they declining? I would anticipate at that point an objection. The purpose of this line of questioning is to show, one, declining patient admissions was a reason [to close the Hospital]; two, DRG payments was a reason; three, the uncollectibility of the [FBCH] loan was a reason.
 
 
 38
 Id. at 14.
 
 
 39
 The court responded:What you want to do and what you are entitled to do is probe their state of mind as to why they [the Foundation's Trustees] made the decision [to close the Hospital] and what the basis of that decision was. And if you ask them if there is any other reason, if you ask them did they consider the DRG's, did they consider the decline in patient admissions, did it play a factor in their decision, that's fine. You can ask those questions.
 
 
 40
 Id. at 17-18.
 
 
 41
 Thus the court permitted the class to make the inquiries about the reasons for the Hospital's closure that it sought to make. The court ruled that the class had not yet shown that it was entitled to the documents it sought, not that the class was outright unentitled to examine the documents. The court was willing to compel production of the documents after the class demonstrated a need for them. The class ultimately deposed seven of the nine members of the Hospital's Board of Trustees as well as the Hospital's comptroller, but did not subsequently accept the court's invitation to report on what occurred or request the information that it had been denied.
 
 
 42
 The other information the class sought to discover--information concerning the Hospital's post-closure financial situation--was irrelevant. The class sought to use the information to assess the Hospital comptroller's projection that, had the Hospital remained open, it would have had a negative cash balance of over $300,000 by March 22, 1990. The class did not dispute that the Hospital's Board of Trustees actually relied on the projection in voting to close the Hospital. It wanted access to information about the Hospital's financial affairs to determine whether the comptroller ultimately was correct. Nevertheless, the issue in this case is not the accounting skills of the Hospital's comptroller, but rather whether the Hospital's Board exercised reasonable business judgment in relying on the projection as of January 22, 1990, the day on which notice would have been required. See 20 C.F.R. § 639.9(b)(2) (1992). Only information that the Board had before it before the closure was relevant. The class therefore was not actually and substantially prejudiced by the district court's refusal to allow discovery of the Hospital's post-closure financial affairs.
 
 C. Assessment of Costs
 
 43
 Finally, the class argues that the district court abused its discretion in assessing costs only against those members of the class who were named in the complaint rather than against all members of the class.[4] We disagree. Although the general rule is that the entire class should share the costs of litigation, see Mills v. Electric Auto-Lite Co., 396 U.S. 375, 392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970), the rule should not be applied in a narrow and technical manner. See Thomas v. Honeybrook Mines, Inc., 428 F.2d 981, 985 (3d Cir.1970). Here the court saddled the active members of the class with all the costs of the litigation because it found (and the class does not challenge) that a significant number of the unnamed members could not bear liability for costs. The basis for the court's decision is reasonable, and therefore we are of the opinion that the decision was not an abuse of the court's discretion.
 
 IV. CONCLUSION
 
 44
 The district court's grant of summary judgment in favor of the Hospital and its order awarding the Hospital $2,314.75 in costs are AFFIRMED.
 
 
 
 [1]
 The WARN Act provides in pertinent part:
 (a) Notice to employees, state dislocated worker units, and local governments
 An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order--
 (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee; and
 (2) to the State dislocated worker unit (designated or created under title III of the Job Training Partnership Act [29 U.S.C.A. § 1651 et seq.] and the chief elected official of the unit of local government within which such closing or layoff is to occur.
 (b) Reduction of notification period
 (2)(A) An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.
 
 
 [2]
 Four members of the nine-member Board of Trustees of the Hospital also were members of the Foundation's Board of Trustees: Sherwin Stone (the President of the Foundation and general counsel to both the Hospital and the Foundation), Patrick A. DeMoon, Patrick S. DeMoon, and Dr. Algirdas Maciunas
 
 
 [3]
 The class also claimed that the Hospital breached an agreement in the Hospital's employee policy manual and violated the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 et seq. (1993), by refusing to pay employees for accumulated sick leave, but the merit of those claims is not on appeal
 
 
 [4]
 The class also argues that the district court abused its discretion in awarding costs without requiring the Hospital to file a supporting affidavit as required by 28 U.S.C. § 1924 (1988). The class waived this argument for purposes of this appeal by failing to object to the absence of an affidavit in the district court. See Kensington Rock Island Ltd. v. American Eagle Historic Partners, 921 F.2d 122, 123 (7th Cir.1990)