NBD BANK, N.A., Plaintiff–Appellant,

v.

Donna D. BENNETT, Indiana Insurance
Commissioner, Defendant–Appellee.

No. 95–1310.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1995.

Decided Oct. 4, 1995.

**630**

Peter J. Rusthoven (argued), Catherine L. Bridge, and David E. Kirtley, Barnes & Thornburg, Indianapolis, IN, for Plaintiff–Appellant.

Terry G. Duga, Deputy Atty. Gen., Jon B. Laramore (argued), Indianapolis, IN, and Richard E. Shevitz, Office of the Attorney General, Indianapolis, IN, for Defendant–Appellee.

Thomas H. Ristine, Ice, Miller, Donadio & Ryan, Indianapolis, IN, John J. Gill, Michael F. Crotty, American Bankers Association, Washington, DC, James T. McIntyre, McNair & Sanford, Washington, DC, Richard M. Whiting, Bankers Roundtable, Washington, DC, Marcia Z. Sullivan, Consumer Bankers Association, Arlington, VA, L. Robert Griffin, Julie L. Williams, Carol E. Robbins, Office of the Comptroller of the Currency, Washington, DC, Jeffrey M. Yates, Independent Insurance Agents of America, Alexandria, VA, David A. Winston, National Association of Life Underwriters, Washington, DC, and Dean R. Sackett, III, National Association of Professional Insurance Agents, Alexandria, VA, for Amici Curiae.

Before COFFEY, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

NBD Bank operates a branch in Corydon, Indiana. Because Corydon has fewer than 5,000 inhabitants, 12 U.S.C. § 92 permits NBD to act as agent for the sale of insurance:

> [A]ny [national bank] association located and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census, may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life or other insurance company authorized by the authorities of the State in which said bank is located to do business in said State, by soliciting and selling insurance and collecting premiums on policies issued by such company. . . .

In 1963 the Comptroller issued a regulation specifying that § 92 applies to branches as well as to banks that have their sole offices in small towns. 12 C.F.R. § 7.7100. So although NBD is a big bank, with operations in several states, it is entitled to sell insurance from the Corydon branch.

Sell insurance to whom? Indiana believes that the answer is "to the inhabitants of Corydon." Its Commissioner of Insurance issued NBD a geographically limited license. Believing that it is entitled to act as agent throughout Indiana, NBD filed this suit for a declaratory judgment to that effect. NBD has the support of the Comptroller, who on May 26, 1994, sent NBD a letter declaring that Indiana's understanding of § 92 is incorrect. NBD also has the support of the only court of appeals that has considered this question. In 1986 the Comptroller's office announced that § 92 limits the location of the sales office, not the location of insureds. After extended preliminaries, see *United States National Bank of Oregon v. Independent Insurance Agents of America, Inc.,* —— U.S. ——, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), the District of Columbia Circuit concluded that the Comptroller's view must be respected. See *Independent Insurance Agents of America, Inc. v. Ludwig,* 997 F.2d 958 (D.C.Cir.1993), relying on *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A magistrate judge, presiding by consent of the parties under 28 U.S.C. § 636(c)(1), disagreed with *Independent Insurance Agents* and granted summary judgment for the Commissioner. 874 F.Supp. 927 (S.D.Ind.1994). "To whom" is the only

question we need consider; Indiana does not contend that the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–15, gives it authority to curtail activities authorized by § 92. Compare *Barnett Bank of Marion County, N.A. v. Gallagher,* 43 F.3d 631, 636–37 (11th Cir. 1995) (McCarran–Ferguson Act supersedes § 92), cert. granted, —— U.S. ——, 116 S.Ct. 39, 132 L.Ed.2d 920 (1995), with *Owensboro National Bank v. Stephens,* 44 F.3d 388 (6th Cir.1994) (§ 92 not affected by McCarran–Ferguson Act).

■ Just as the Comptroller observed, § 92 prescribes the location of the bank, not the location of its customers. Any national bank "located and doing business in any place the population of which does not exceed five thousand inhabitants" may act as agent for the sale of insurance by a company authorized to do business in the state. To the extent the statute implies anything about the location of insureds, it is that the customers must reside in a place in which the *insurer* is authorized to do business; the bank acts as the insurer's agent.

■ That § 92 does not mention clients does not necessarily mean that the bank's customers can come from the far reaches of the globe. Interpretation is a contextual enterprise. Statutory words take color from their many contexts—often neighboring sentences and sections, and frequently the economic transactions the words are designed to affect. Section 92 identifies a line of business in which national banks may engage. What of their other lines of business? May banks take deposits from persons located outside their home bases? Make loans to residents of other cities and states? If the answer is "yes," then the absence of any customer limitations in § 92 implies equal freedom; but if banks may do deposit-and-loan business only close to home, then the absence of a reference to customers in § 92 implies that banks are similarly confined when acting as insurance agents.

May NBD's Corydon branch take deposits from the residents of neighboring Crandall? May it make loans to residents of New Albany, some 20 miles to the east? May it issue credit cards to residents of Louisville, Kentucky, across the Ohio River from New Alba-

ny? These questions have ready answers. Ever since the founding of the United States, banks have transacted business across state and local borders. See *Bank of Augusta v. Earle,* 38 U.S. (13 Pet.) 519, 10 L.Ed. 274 (1839). By 1864, when Congress enacted the National Bank Act, interstate banking was a flourishing business, a subject much remarked in the debates. *Marquette National Bank of Minneapolis v. First of Omaha Service Corp.,* 439 U.S. 299, 315–19, 99 S.Ct. 540, 549–50, 58 L.Ed.2d 534 (1978), recounts this history. Today banks in New York join with banks in Texas to make syndicated loans secured by real estate in Alaska; banks in Illinois issue letters of credit to Portuguese corporations in order to facilitate shipments between Brazil and Japan; banks in Arizona issue credit cards to residents of Maine; the citizens of North Dakota can put their assets in trusts managed by banks in Florida and write checks on banks in Hawaii; and banks resell their loans to packagers (including public bodies such as GNMA) who trade the securities on international financial exchanges. These transactions simultaneously facilitate commerce, increase competition to the benefit of consumers, and help banks diversify their portfolios (reducing the risk of failure).

The only serious challenge to these practices during this century was rebuffed in *Marquette National Bank.* A portion of the National Bank Act permits a national bank to charge any rate of interest that is proper under the laws of the state "where the bank is located". 12 U.S.C. § 85. A bank with premises in Nebraska, which allowed interest rates to reach 18%, issued credit cards to residents of Minnesota, which capped interest rates at 12%. The Supreme Court first explained that this trans-border transaction was entirely proper and then held that a bank is "located" for purposes of § 85 where its physical facilities may be found, rather than where its customers live. Responding to the complaint of a Minnesota Bank that did not appreciate the competition, the Court wrote:

> Omaha Bank cannot be deprived of this [physical] location merely because it is extending credit to residents of a foreign

State. Minnesota residents were always free to visit Nebraska and receive loans in that State. It has not been suggested that Minnesota usury laws would apply to such transactions. Although the convenience of modern mail permits Minnesota residents holding Omaha Bank's [credit cards] to receive loans without visiting Nebraska, credit on the use of their cards is nevertheless similarly extended by Omaha Bank in Nebraska by the bank's honoring of the sales drafts of participating Minnesota merchants and banks.

439 U.S. at 310–11, 99 S.Ct. at 546–47 (footnote omitted). In other words, the Nebraska bank made its loans "in" Nebraska by honoring the drafts, even though neither borrower nor merchant ever visited Nebraska.

■ Have we any reason to treat § 92 differently from § 85? Both statutes use the term "located", and *Marquette National Bank* disposes of Indiana's contention that a bank's business is "located" where the customer resides rather than at the bank's premises. Similarly *Marquette National Bank* shows that a national bank is "doing business" at its premises rather than the addresses of its customers. Cf. 12 U.S.C. § 22. If national banks have been able to engage in interstate transactions ever since 1864, when they were created, then transactions with customers living outside the bank's home town are the background against which we must understand § 92. If Congress wanted to curtail the universe of permissible customers when it enacted § 92 in 1916, it had to say something to countermand this power. As it happens, Congress did—but not for insurance. Part of the original § 92 permitted banks to "act as the broker or agent for others in making or procuring loans on real estate located within one hundred miles of the place in which said bank may be located". 39 Stat. 753 (1916). Congress later repealed this loan brokerage provision, 96 Stat. 1511 (1982), leaving the insurance provision in force. This sequence shows that the Congress of 1916 understood that national banks could transact business without regard to their customers' locations, unless the law said otherwise. When authorizing loan brokerage Congress said otherwise; when authorizing insurance agency it did not

say otherwise. Section 92 therefore permits small-town banks to act as insurance agents without regard to the location of customers.

■ Any doubt on this score—and this history leaves no real doubt—is dispelled by the Comptroller's interpretation. Section 92 delegates regulatory power to the Comptroller of the Currency, and the holder of a delegated power is entitled to fill gaps and resolve ambiguities. See *NationsBank of North Carolina, N.A. v. Variable Annuity Life Insurance Co.,* —— U.S. ——, ——–—, 115 S.Ct. 810, 813–14, 130 L.Ed.2d 740 (1995), saying this about § 92 itself. The Comptroller believes not only that § 92 permits small-town branches to sell insurance but also that these sales are desirable: they enhance banks' revenues, diversify their business without creating any threat to their solvency, and increase competition. Banks, buyers of insurance, and the federal deposit insurance fund all gain. That the Comptroller's interpretation bears a 1986 date does not detract from its authority. Delegation implies the power to reexamine and change one's view; ours is in this respect quite different from cases in which the agency does *not* hold a delegated power, and the court looks to the administrative interpretation only for clues about the original understanding of a law. See *Atchison, Topeka & Santa Fe Ry. v. Peña,* 44 F.3d 437, 445–46 (7th Cir.1994) (en banc) (concurring opinion), cert. granted under the name *Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry.,* —— U.S. ——, 115 S.Ct. 2575, 132 L.Ed.2d 826 (1995). *NationsBank of North Carolina* deferred to an interpretation from the 1980s; we follow suit.

The magistrate judge took a different view of the interaction between legislative and executive branches. She wrote:

Logic and common sense dictates that Congress had an intent, one way or the other, regarding the geographic scope of this authority. Either Congress intended to permit banks in small towns to sell insurance only to customers within those towns, or it intended to permit those banks to sell insurance to customers anywhere.

874 F.Supp. at 930. Attempting to reconstruct what Members of Congress might have had in mind in 1916, the magistrate judge concluded that Congress intended to permit only local insurance transactions. This understanding is simultaneously false and irrelevant.

█ It is false because Congress is not omniscient. Many a statute resolves a portion of a problem, leaving other issues to the future—perhaps because the questions did not occur to anyone at the time, perhaps because a clash of competing objectives left Congress unable to answer them. No Member of Congress can anticipate all questions that will come to light; and a body containing hundreds of members with divergent agendas can't answer even a small portion of the questions that do occur to its members. That is one reason why Congress frequently delegates power to executive officials, as it did in § 92. A presumption that Congress has resolved *every* question, with answers to be found if only the judiciary can look with a powerful loupe, would leave no room for the exercise of the delegated power.

█ It is irrelevant because it assumes that a legislative *belief,* divorced from an enacted *text,* has legal effect. We must separate two questions: (1) What did Congress think the words of § 92 meant? (Assume for the moment that a collective body can "think" or "intend" anything at all.) (2) How did Congress expect things to turn out in a world governed by the new statute? The former question concerns the interpretation of the law; legislative "intent" is relevant in the sense that it shows how the legal community understood these words at the time. The latter question rarely assists the interpretive enterprise, because "intent" is useful only to the extent it helps illuminate the meaning of the enacted statute. It does not matter what Congress intended in the abstract; the question is what it meant by what it enacted.

For example, if Congress repeals the price controls on natural gas expecting to produce an untrammeled market, this expectation still does not affect other laws that regulate the market. See *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.,*

485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988). Congress appropriates money expecting particular groups to benefit; but an expectation that cannot be mapped to a statutory rule does not govern expenditures. See *Lincoln v. Vigil,* —— U.S. ——, —— ——, 113 S.Ct. 2024, 2031–32, 124 L.Ed.2d 101 (1993). Cf. *In re Sinclair,* 870 F.2d 1340 (7th Cir.1989). Unanticipated developments frustrate many a drafter. So it was with § 85; in 1864 Congress could not have anticipated credit cards and the computers that make them possible, but the Court did not suggest that this lack of precognition limited the scope of the law. Economic changes (the transistor, high speed interstate communications networks, and so on) greatly altered the *effect* of § 85 without altering its meaning. Surprises may prod the legislature to revisit the subject—Congress is today considering fundamental changes in the banking laws— but do not permit courts to change the meaning of existing statutes. See *American Hospital Association v. NLRB,* 499 U.S. 606, 617, 111 S.Ct. 1539, 1545, 113 L.Ed.2d 675 (1991); *West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 100–01 & n. 7, 111 S.Ct. 1138, 1147–48 & n. 7, 113 L.Ed.2d 68 (1991); *National Broiler Marketing Ass'n v. United States,* 436 U.S. 816, 827, 98 S.Ct. 2122, 2129, 56 L.Ed.2d 728 (1978).

None of the surviving text of § 92 imposes geographic limits on customers. Intent in the abstract cannot be used to decode a text, and therefore does not limit the scope of the Comptroller's delegated regulatory power. We add, for what little it is worth, that the legislative history of § 92 is equally silent about the location of customers. Both text and history do treat with the location of the banks, and two courts of appeals have understood § 92 to create the negative implication that banks *not* located in small towns may *not* serve as insurance agents. *Variable Annuity Life Insurance Co. v. Clarke,* 998 F.2d 1295, 1302 (5th Cir.1993), reversed under the name *NationsBank of North Carolina, N.A. v. Variable Annuity Life Insurance Co.,* —— U.S. ——, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995); *American Land Title Ass'n v. Clarke,* 968 F.2d 150, 155–56 (2d Cir.1992). When reversing the fifth circuit in *Nations-*

*Bank of North Carolina* the Supreme Court reserved judgment on this question. —— U.S. at ——, 115 S.Ct. at 815. Let us assume, as the Supreme Court did in *CIR v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 401–02, 92 S.Ct. 1085, 1090, 31 L.Ed.2d 318 (1972), that § 92 carries this negative implication. All this shows is that banks cannot act as insurance agents from locations outside small towns; like § 92 itself, it concerns the location of the bank and not the location of the customer.

 One final issue requires brief attention. Indiana argued that this suit should have been filed in state rather than federal court, a position the magistrate judge rejected. 874 F.Supp. 924 (S.D.Ind.1994). Our opinion in *Alleghany Corp. v. Haase*, 896 F.2d 1046 (7th Cir.1990), vacated in part as moot, 499 U.S. 933, 111 S.Ct. 1383, 113 L.Ed.2d 441 (1991), disposes of the state's principal argument. Although mootness led to vacatur, we are convinced that the legal analysis of *Alleghany* remains sound, and it need not be repeated. See also *Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th Cir.1992). One of the three claims in NBD's complaint, however, is more problematic. NBD invoked a provision of Indiana law that authorizes judicial review of administrative decisions. Ind.Code § 4–21.5–5–14(d). To the extent that NBD relies on state law as the foundation for relief against the State of Indiana, the eleventh amendment bars the way. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Indiana's Commissioner of Insurance, sued in her official capacity, is "the state" for constitutional purposes. *Will v. Michigan Department of State Police*, 491 U.S. 58, 70–71, 109 S.Ct. 2304, 2311–12, 105 L.Ed.2d 45 (1989). A state may waive its immunity to suit in its own courts without authorizing suit in federal court. *Port Authority Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 306, 110 S.Ct. 1868, 1873, 109 L.Ed.2d 264 (1990); *Florida Department of Health & Rehabilitative Services v. Florida Nursing Home Ass'n*, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67 L.Ed.2d 132 (1981). NBD replies that it is not seeking relief on the basis of state law. As it characterizes matters, Ind.Code § 4–21.5–5–14(d) supplies authority to annul administrative action that is contrary to law, and the only law in question is § 92; relief therefore would be based on federal rather than state law. On this understanding, however, Ind.Code § 4–21.5–5–14(d) is a jurisdictional provision and therefore irrelevant in this litigation; state statutes granting authority to one or another state court have no bearing in a federal tribunal. State law could be relevant here only as a substantive limit on the power of the Insurance Commissioner or as a waiver of immunity, and there is a problem under the eleventh amendment either way.

The judgment of the district court is therefore vacated, to the extent that court rendered a decision under Ind.Code § 4–21.5–5–14(d), and the case is remanded with instructions to dismiss the state-law claim for want of jurisdiction. The remainder of the judgment is reversed, and on remand the district court must enter a declaratory judgment appropriate in light of this opinion.