Justice ALITO, concurring in part and dissenting in part.
I agree with the Court that the judgment below must be reversed, and I join all of the Court's opinion except Part II-B. I thus agree with the Court that we possess jurisdiction to decide this case. See ante , at 1349. I also agree that the landowners are potentially responsible parties under § 122(e)(6) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and, as a result, cannot bring their Montana restoration damages claim without the consent of the Environmental Protection Agency (EPA). See ante , at 1351 - 1357. At this point, however, I am not willing to endorse the Court's holding in Part II-B that state courts have jurisdiction to entertain "challenges" to EPA-approved CERCLA plans.
I
I would not decide that question because it is neither necessary nor prudent for us to do so. As I understand the Court's opinion, the Montana Supreme Court has two options on remand: (1) enter a stay to allow the landowners to seek EPA approval or (2) enter judgment against the landowners on their restoration damages claim without prejudice to their ability to refile if they obtain EPA approval. Either way, the case cannot proceed without the EPA's blessing. And because the EPA has submitted multiple filings indicating that it believes that the landowners' plan presents serious environmental risks, it is likely that the EPA will not approve that plan, and the case will then die. If that happens, the question of the state courts' jurisdiction will be academic.
Alternatively, if the EPA approves the landowners' plan, either in full or to a degree that they find satisfactory, they may not wish to press this litigation. And if they do choose to go forward, the question of state-court jurisdiction can be decided at that time.
For these reasons, there is no need to reach out and decide the question now,[1] *1358 and there are good reasons not to do so. While the question of state-court jurisdiction may turn out not to matter in this case, that question may have important implications in other cases. Specifically, if the fears expressed by the Government materialize, state courts and juries, eager to serve local interests, may disregard the EPA's expert judgment regarding the best plan for a CERCLA site and may mandate relief that exacerbates environmental problems. See Brief for United States as Amicus Curiae 20-22, 29-30; App. to Pet. for Cert. 72a-74a. Thus, much is potentially at stake, and the question whether CERCLA allows state courts to entertain suits like the one in this case depends on the interpretation of devilishly difficult statutory provisions, CERCLA §§ 113(b) and (h), 42 U.S.C. §§ 9613(b) and (h).
With much at stake, we should be confident that our answer is correct, and we have no basis for such confidence here. The question of state-court jurisdiction is only one of many in this case, and the briefing and argument on that issue left important questions without fully satisfactory answers. The Court tries to clear up what § 113 means, but as I will attempt to show, the Court's interpretation presents serious problems. Under these circumstances, the better course is not to decide this perplexing question at this juncture.
II
A
CERCLA § 113 is like a puzzle with pieces that are exceedingly difficult, if not impossible, to fit together. Here is what these provisions say, with language that is not pertinent for present purposes omitted:
"(b) Jurisdiction; venue
"Except as provided in subsectio [n] ... (h) of this section [and another provision not relevant for present purposes], the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy....
.....
"(h) Timing of review
"No Federal court shall have jurisdiction under Federal law other than under section 1332 of title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title [CERCLA § 121, 42 U.S.C. § 9621 ] (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title [concerning emergency measures ordered by the President], in any action except one of [a list of specific CERCLA provisions]." 42 U.S.C. § 9613.
For present purposes, the pertinent parts are as follows:
• First, § 113(b) sets out a general rule conferring on the federal district courts exclusive jurisdiction over claims "arising under" CERCLA. And it does so "without regard to the citizenship of the parties or the amount in controversy."
• Second, §§ 113(b) and (h), taken together, reduce this grant of jurisdiction by taking away jurisdiction over most claims that "challeng [e]" a "removal or remedial action."
• Third, this reduction does not apply to a challenge to removal or remedial action if it is brought under the diversity jurisdiction statute, 28 U.S.C. § 1332.
• Fourth, this reduction also does not apply to a challenge to removal or *1359 remedial action if it is brought in federal court "under State law which is applicable or relevant and appropriate under [§ 121] (relating to cleanup standards)." Under § 121, cleanup standards must comply with certain state-law requirements, and thus the thrust of this last provision seems to be that a removal or remedial action may be challenged in federal court for noncompliance with such requirements.
With these pieces laid out, we may consider how the Court and respondents, on the one hand, and the Government and petitioner, on the other, try to fit them together.
B
The logical first step in any effort to understand how §§ 113(b) and (h) apply to the landowners' state-law restoration damages claim is to determine whether the claim falls within the scope of the exclusive jurisdiction that § 113(b) confers on the federal district courts-in other words, whether such a claim is one that "aris[es] under" CERCLA. If it does not, then that ends the inquiry. And that is what the Court holds. Ante , at 1349 - 1350.
The Court interprets the phrase "arising under" in § 113(b) to mean the same thing as that phrase means in the federal-question jurisdiction statute, 28 U.S.C. § 1331. Under that provision, as the Court puts it, "[i]n the mine run of cases, '[a] suit arises under the law that creates the cause of action.' " Ante , at 1349 - 1350 (quoting American Well Works Co. v. Layne & Bowler Co. , 241 U.S. 257, 260, 36 S.Ct. 585, 60 L.Ed. 987 (1916) ). Thus, the Court concludes, a claim arises under CERCLA only if it is based on CERCLA, and since the landowners' restoration damages claim is based on Montana law, it is obviously not based on CERCLA and does not fall within the exclusive jurisdiction conferred on the district courts by § 113(b). This makes short work of the question of state-court jurisdiction, but it presents serious problems.
First, it cannot explain why § 113(b) says that the jurisdiction it confers is "without regard to the citizenship of the parties or the amount in controversy." If that jurisdiction is limited to claims that are based on CERCLA, district courts have jurisdiction to entertain all those claims under 28 U.S.C. § 1331, which does not require either diversity or any minimum amount in controversy. So why go out of the way to say that § 113(b) jurisdiction does not require diversity or any minimum amount in controversy? The only logical reason is to ensure that the provision covers suits that could not be brought under 28 U.S.C. § 1331 . Thus, § 113(b) jurisdiction must be broader than general federal-question jurisdiction. By denying this, the Court's interpretation turns the phrase "without regard to the citizenship of the parties or the amount in controversy" into a meaningless and useless appendage.
Second, under the Court's interpretation, there is no reason why § 113(h) should specify that its reduction of the scope of the jurisdiction conferred by § 113(b) does not affect a district court's jurisdiction in diversity cases. If the jurisdiction granted by § 113(b) is limited to claims based on CERCLA, why would anyone think that it had any impact on state-law claims?[2]
*1360 Third, if the jurisdiction conferred by § 113(b) is limited to claims based on CERCLA, it is unclear how a district court could entertain a claim "under State law which is applicable or relevant and appropriate under [§ 121] (relating to cleanup standards)." Yet § 113(h) exempts such a claim from its general withdrawal of jurisdiction over challenges to removal or remedial action. It seems clear that Congress did not regard these claims as claims under CERCLA itself, since it describes them as "under State law" and did not include them on the list of claims under CERCLA that it likewise exempted from § 113(h)'s general withdrawal of jurisdiction over challenges to removal or remedial action. §§ 113(h)(1)-(5). These three problems raise serious doubt about the correctness of the Court's interpretation.[3]
C
The Government and petitioner advance a different interpretation of §§ 113(b) and (h), and although this interpretation solves the problems noted above, it has problems of its own. The Court, as noted, runs into trouble by interpreting the phrase "arising under" CERCLA in § 113(b) to mean what "arising under" means in 28 U.S.C. § 1331. The Government obviates this difficulty by arguing that "arising under" in § 113(b) has a broader meaning, such as the meaning of the same phrase in Article III of the Constitution. See Brief for United States as Amicus Curiae 23-24. The Government suggests that "arising under" in § 113(b) may reach " 'any case or controversy that might call for the application of federal law.' " Id ., at 24 (quoting Verlinden B. V. v. Central Bank of Nigeria , 461 U.S. 480, 492, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) ). If § 113(b) uses the phrase in something like this sense, the jurisdiction it confers can reach some claims under state law, and that would explain § 113(b)'s specification that this jurisdiction is not dependent on either diversity or amount in controversy. In other words, this language makes clear that federal district courts have jurisdiction to hear these state-law claims without the restrictions that usually apply when federal courts entertain such claims.
Up to this point, the interpretation favored by the Government and petitioner proceeds smoothly, but it stumbles when it moves from § 113(b) to § 113(h). That provision reduces the grant of jurisdiction in § 113(b) by taking away jurisdiction over challenges to removal and remedial action unless, among other things, those claims are brought in a diversity action. The upshot is that federal district courts are left with jurisdiction over most state-law claims that challenge removal and remedial *1361 action only where the parties are diverse.[4] If it turns out that diversity is lacking, the district courts cannot entertain the same claims. And not only that. Because § 113(b)'s grant of jurisdiction to the federal district courts is exclusive, the state courts cannot entertain those claims either.
It is hard to fathom why Congress might have wanted such a scheme. Congress might have wanted all the state-law claims covered by § 113(b) to be heard exclusively in federal court in order to prevent state courts and juries from unduly favoring home-state interests. But having granted the federal district courts jurisdiction to hear these claims in § 113(b), why would Congress take away that jurisdiction in cases where the parties happen not to be diverse? And why would Congress go further and prevent the state courts from hearing these claims? The Government and petitioner provide no answer, and none is apparent.
III
The Court gives three reasons for resolving the question of state-court jurisdiction. See ante , at 1349, n. 3. None is compelling.
First, the Court explains that "Atlantic Richfield seeks more than a remand," namely, it seeks a remand with instructions to dismiss on jurisdictional grounds. Ibid . But Atlantic Richfield presented its § 122(e)(6) theory as an alternate ground for reversal, and has prevailed on that basis. As Atlantic Richfield's counsel stated at argument, the § 122(e)(6) ruling is "sufficient to resolve the case." Tr. of Oral Arg. 17-18.
Second, the Court says, "leaving the [§ 113] question unanswered ... would leave the parties in a state of uncertainty." Ante , at 1349, n. 3. But, as described above, there appears to be a slim chance that this case will, at least in its current state, "procee[d]" in the Montana courts. Ibid.
Third, the Court suggests that the grant of review, briefing, and argument on § 113 may warrant resolving the question of state-court jurisdiction. Ibid. But that presentation has not cleared up serious issues surrounding §§ 113(b) and (h). And sunk costs cannot justify a departure from our usual practice of "deciding only what is necessary to the disposition of the immediate case." Whitehouse v. Illinois Central R. Co. , 349 U.S. 366, 373, 75 S.Ct. 845, 99 L.Ed. 1155 (1955).
* * *
Section 113 may simply be a piece of very bad draftsmanship, with pieces that cannot be made to fit together. Or it may be a puzzle with a solution that neither the parties, the Court, nor I have been able to solve. In a later case, briefing and argument may provide answers that have thus far eluded us. Since we are not required to attempt an answer in this case, the prudent course is to hold back.
Justice GORSUCH, with whom Justice THOMAS joins, concurring in part and dissenting in part.
For nearly a century, Atlantic Richfield's predecessor operated a smelter near the town of Opportunity, Montana. At one time, the smelter produced much of the Nation's copper supply and served as the State's largest employer. App. 311. Eventually, though, it became apparent the smelter was producing more than just copper and jobs. Studies showed that the *1362 plant emitted up to 62 tons of arsenic and 10 tons of lead each day. Brief for Respondents 7. Thanks to what was once the world's tallest brick smokestack, these heavy metals blanketed the town and the whole of the Deer Lodge Valley-contaminating hundreds of square miles. Today, the smokestack is all that is left of the once massive operation. It stands alone in a state park, much of which remains dangerously contaminated and closed to the public. Visitors may view the stack, but only from a distance, through fences and between huge slag piles. Id. , at 9.
This case involves nearly 100 nearby residents. Some have lived in their homes for decades, some long before the environmental consequences of the smelter were fully appreciated. They say they have thought about moving, but for many their property values aren't what they once were. Besides, as one homeowner put it, "I couldn't find a kitchen door that's got all my kids' heights on it." Id., at 8.
The federal government has tried to help in its own way. In 1983, the government designated the 300-square-mile area surrounding the smelter a Superfund site under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 94 Stat. 2767, as amended, 42 U.S.C. § 9601 et seq . After years of study and negotiation, the government ordered Atlantic Richfield to remove up to 18 inches of soil in residential yards with arsenic levels exceeding 250 parts per million (ppm). App. 94-95. For so-called "pasture land"-that is, nearly everything else-the government set the threshold for soil removal at 1,000 ppm. Brief for Respondents 8. By way of reference, even 100 ppm is sometimes considered too toxic for local landfills, and the federal government itself has elsewhere set a threshold of 25 ppm. Ibid. Some States set residential cleanup levels as low as 0.04 ppm. Ibid.
The cleanup work that followed left much to be desired. By 2016, Atlantic Richfield claimed that it had virtually finished work on the landowners' properties. Yet, only 24 of their 77 properties had been remediated, and only about 5 percent of the total acreage had been touched. Id ., at 9. Soil near Tammy Peters's daycare playground, for example, still shows an arsenic level of 292 ppm. But because the "weighted average" for her yard is below 250 ppm, Atlantic Richfield performed no cleanup of the playground at all. Id ., at 10.
So the landowners here proceeded as landowners historically have: They sought remedies for the pollution on their lands in state court under state law. Their choice can come as no surprise. The federal government enjoys no general power to regulate private lands; it may intervene only consistent with the Commerce Clause or some other constitutionally enumerated power. Nor does the federal government always intervene as fully as it might even when it can. Meanwhile, the regulation of real property and the protection of natural resources is a traditional and central responsibility of state governments. And States have long allowed landowners to seek redress for the pollution of their lands through ancient common law causes of action like nuisance and trespass. The landowners employed exactly these theories when they brought suit in state court seeking restoration damages from Atlantic Richfield-money that could be used only to remove arsenic, lead, and other toxins from their properties. The Montana Supreme Court has held that the landowners' case states a viable claim for relief and warrants trial.
Now, however, Atlantic Richfield wants us to call a halt to the proceedings. The company insists that CERCLA preempts and prohibits common law tort suits like this one. On Atlantic Richfield's telling, *1363 CERCLA even prevents private landowners from voluntarily remediating their own properties at their own expense. No one may do anything in 300 square miles of Montana, the company insists, without first securing the federal government's permission.
But what in the law commands that result? Everything in CERCLA suggests that it seeks to supplement, not supplant, traditional state law remedies and promote, not prohibit, efforts to restore contaminated land. Congress hardly could have been clearer. It stated that, "[n]othing in this [Act] shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a). It added that "[n]othing in this [Act] shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." § 9652(d). And it said again that "[t]his [Act] does not affect or otherwise impair the rights of any person under Federal, State, or common law, except with respect to the timing of review as provided" elsewhere in provisions that even the Court today does not invoke as limits on recovery here. § 9659(h). Three times Congress made its point as plainly as anyone might.
So how does Atlantic Richfield seek to transform CERCLA from a tool to aid cleanups into a ban on them? The company has to point to something in the statutory text that trumps these many provisions and preempts the landowners' right to use state law to restore their lands. After all, merely "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law"; instead, a party like Atlantic Richfield seeking to displace state law must identify " 'a constitutional text or a federal statute' that does the displacing." Virginia Uranium, Inc. v. Warren , 587 U. S. ----, ----, 139 S.Ct. 1894, 1901, 204 L.Ed.2d 377 (2019) (opinion of GORSUCH, J.) (quoting Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp. , 485 U.S. 495, 503, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988) ).
In answer, Atlantic Richfield directs our attention to § 122(e)(6). It's a provision buried in a section captioned "Settlements." The section outlines the process private parties must follow to negotiate a settlement and release of CERCLA liability with the federal government. Subsection (e)(6) bears the title "Inconsistent response action" and states that, "[w]hen either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President." 42 U.S.C. § 9622(e)(6). So even read for all its worth, this provision only bars those "potentially responsible" to the federal government from initiating cleanup efforts without prior approval. To get where it needs to go, Atlantic Richfield must find some way to label the innocent landowners here "potentially responsible part[ies]" on the hook for cleanup duties with the federal government.
They are hardly that. When interpreting a statute, this Court applies the law's ordinary public meaning at the time of the statute's adoption, here 1980. See Wisconsin Central Ltd. v. United States , 585 U. S. ----, ----, 138 S.Ct. 2067, 2074, 201 L.Ed.2d 490 (2018). To be "potentially responsible" for something meant then, as it *1364 does today, that a person could possibly be held accountable for it; the outcome is capable of happening. American Heritage Dictionary 1025 (1981); Webster's New Collegiate Dictionary 893 (1980). And there is simply no way the landowners here are potentially, possibly, or capable of being held liable by the federal government for anything. In the first place, the federal government never notified the landowners that they might be responsible parties, as it must under § 122(e)(1). Additionally, everyone admits that the period allowed for bringing a CERLCA claim against them has long since passed under § 113(g)(2)(B). On any reasonable account, the landowners are potentially responsible to the government for exactly nothing.
Statutory context is of a piece with the narrow text. Nothing in § 122 affects the rights of strangers to the federal government's settlement process. Everything in the section speaks to the details of that process. The section requires the government to provide all potentially responsible parties with notice that they might be held responsible for remedial measures. § 9622(e)(1). It instructs the government to give a potentially responsible party a list of everyone else so designated. Ibid. It specifies procedures for sharing proposals and counterproposals among this group. §§ 9622(e)(2)-(3). It allows the government to release from federal liability those who agree to settle and clean up hazardous sites. See §§ 9622(a) - (c). And because parties who settle with the federal government may seek cleanup costs they incurred prior to settlement from other potentially responsible parties, subsection (e)(6) bars a potentially responsible party from taking unauthorized remedial measures. See §§ 922(e)(1)-(3), (h). This ensures the government can control the shape of any final settlement and no private party can unilaterally incur costs that it might then foist on others. At the end of it all, the section does just what its title suggests. It governs the settlement process among those who have something to settle . It says nothing about the rights and duties of individuals who, like the landowners here, have nothing to settle because they face no potential liability.
Then there's what the rest of the statute tells us. As we've seen, CERCLA says again and again that it does not impair the rights of individuals under state law. That instruction makes perfect sense and does plenty of work if § 122 only requires those potentially liable to the federal government to secure permission before engaging in cleanup efforts. By contrast, reading § 122 to bar nearly everyone from undertaking remedial efforts without federal permission renders CERCLA's many and emphatic promises about protecting existing state law rights practically dead letters. Sure, the federal government would still have to "involv[e]" state officials and comply with state laws-or at least those laws federal agency employees deem "relevant and appropriate." §§ 9621(f )(1), (d)(2)(A)(ii). But CERCLA would promise nothing more than observer status for state law and those who wish to rely on it. States and private landowners alike who lack any potential federal liability could be barred even from undertaking remedial efforts on their own lands at their own expense, required instead to host toxic wastes involuntarily and indefinitely. Rather than supplementing state remedial efforts, CERCLA would rule them all.
Reading CERCLA this way would raise uneasy constitutional questions too. If CERCLA really did allow the federal government to order innocent landowners to house another party's pollutants involuntarily, it would invite weighty takings arguments under the Fifth Amendment. See *1365 Loretto v. Teleprompter Manhattan CATV Corp. , 458 U.S. 419, 421, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). And if the statute really did grant the federal government the power to regulate virtually each shovelful of dirt homeowners may dig on their own properties, it would sorely test the reaches of Congress's power under the Commerce Clause. See National Federation of Independent Business v. Sebelius , 567 U.S. 519, 551-553, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012).
Atlantic Richfield's replies do nothing to address these problems. Instead of making some helpful textual or contextual rejoinder about § 122, the company asks us look somewhere else entirely. Now, Atlantic Richfield says, we should direct our attention to § 107, a provision that lists four classes of "[c]overed persons" the federal government is authorized to sue under CERCLA. One of these classes encompasses any person who owns a "facility" where hazardous waste has "come to be located." §§ 9607, 9601(9). Because the landowners' properties qualify as "facilit[ies]" where Atlantic Richfield's waste has come to be located, everyone admits the landowners themselves are "[c]overed persons." And, according to Atlantic Richfield, this necessarily means they are also "potentially responsible part[ies]" subject to § 122(e)(6)'s requirement that they seek federal permission before proceeding with any cleanup.
But notice the linguistic contortion and logical leap. Linguistically, § 107 identifies the "[c]overed persons" the government is authorized to sue. Section 122 requires a "potentially responsible party" seeking settlement with and discharge of liability from the federal government to obtain its permission before engaging in a cleanup. The terms use different language, appear in different statutory sections, and address different matters. Nor are these two sections the only ones like them. CERCLA differentiates between covered persons and potentially responsible parties in many places: Some sections apply to all persons covered by § 107 (see, e.g., 42 U.S.C. §§ 9619(d), 9624(b) ), while others extend their mandates only to potentially responsible parties (see, e.g., §§ 9604, 9605, 9611 ). Logically, too, the concepts are distinct. Yes, a potentially responsible party must be a covered person the government is authorized to sue. But the inverse does not follow. It is possible to be a person the government is authorized to sue without also being a person the government has chosen to single out for potential responsibility. Atlantic Richfield's argument, thus, essentially proceeds like this: Disregard the differences in language; then assume Congress chose its terms randomly throughout the law; and, finally, conflate logically distinct concepts.
Our case illustrates the significance of the distinction Congress drew and Atlantic Richfield would have us ignore. Maybe the federal government was once authorized by § 107 to include the innocent landowners here in a CERCLA suit. But few statutes pursue their purpose single-mindedly or require their full enforcement. And as we've seen, at least two things happened that preclude these landowners from being held responsible for anything: The government chose not to notify them of potential liability under § 122(e)(3), and it declined to bring suit within the period prescribed by § 113(g)(2)(B). Under the plain and ordinary meaning of the statutory terms before us, these landowners are not potentially responsible parties and CERCLA doesn't require them to seek permission from federal officials before cleaning their own lands. If Congress had wished to extend its ask-before-cleaning rule to every covered person-including those the government chooses not to pursue for potential liability-all it had to do was say so. Congress displayed no trouble using the term "[c]overed persons" elsewhere in the *1366 statute. See, e.g., §§ 9619(d), 9624(b)(2). Conspicuously, it made a different choice here.
Without any plausible foundation in the statute to support its position, Atlantic Richfield resorts to this odd argument. Maybe the terms "[c]overed persons" and "potentially responsible party" are different and the statute uses them in different places to do different things. But, the company insists, we must conflate them now because this Court has conflated them before. In particular, Atlantic Richfield points to language in United States v. Atlantic Research Corp. , 551 U.S. 128, 127 S.Ct. 2331, 168 L.Ed.2d 28 (2007), where the Court spoke of "Section 107(a) [as] defin[ing] four categories of PRPs [potentially responsible parties]." Id ., at 131-132, 127 S.Ct. 2331.
That may be so but it does not make it so. The relationship between the terms "[c]overed persons" under § 107 and "potentially responsible part[ies]" under § 122 is of critical importance in this case, but it was not briefed, argued, or decided in Atlantic Research . Instead, the only question there concerned the meaning of the term "[c]overed persons" under § 107. Though the Court employed the term "PRP" to describe "[c]overed persons," nothing turned on the use or meaning of the acronym: Replace every reference to "PRP" with "[c]overed person" and the Court's holding and reasoning remains the same. This Court has long warned that matters " 'lurk[ing] in the record, neither brought to the attention of the court nor ruled upon,' " should not be read as having decided anything. Cooper Industries, Inc. v. Aviall Services, Inc. , 543 U.S. 157, 170, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004) (quoting Webster v. Fall , 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925) ). We have warned, too, against reading our judicial opinions as if they were some sort of legislative code because, otherwise, innocent and inconsequential judicial remarks might mistakenly come to trump democratically adopted laws. See Reiter v. Sonotone Corp. , 442 U.S. 330, 341, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Atlantic Richfield would have us ignore these teachings and confuse a stray remark with a rule of law.
In the end, the company's case cannot help but be seen for what it really is: an appeal to policy. On its view, things would be so much more orderly if the federal government ran everything. And, let's be honest, the implication here is that property owners cannot be trusted to clean up their lands without causing trouble (especially for Atlantic Richfield). Nor, we are told, should Montanans worry so much: The restrictions Atlantic Richfield proposes aren't really that draconian because homeowners would still be free to do things like build sandboxes for their grandchildren (provided, of course, they don't scoop out too much arsenic in the process).
But, as in so many cases that come before this Court, the policy arguments here cut both ways. Maybe paternalistic central planning cannot tolerate parallel state law efforts to restore state lands. But maybe, too, good government and environmental protection would be better served if state law remedies proceeded alongside federal efforts. State and federal law enforcement usually work in just this way, complementing rather than displacing one another. And, anyway, how long would Atlantic Richfield have us enforce what amounts to a federal easement requiring landowners to house toxic waste on their lands? The government has been on site since 1983; work supposedly finished around the landowners' homes in 2016; the completion of "primary" cleanup efforts is "estimated" to happen by 2025. So, yes, once a Superfund site is "delisted," the *1367 restrictions on potentially responsible parties fade away. But this project is well on its way to the half-century mark and still only a "preliminary" deadline lies on the horizon. No one before us will even hazard a guess when the work will finish and a "delisting" might come. On Atlantic Richfield's view, generations have come and gone and more may follow before the plaintiffs can clean their land.
The real problem, of course, is that Congress, not this Court, is supposed to make judgments between competing policy arguments like these. And, as we've seen, Congress has offered its judgment repeatedly and clearly. CERCLA sought to add to, not detract from, state law remedial efforts. It endorsed a federalized, not a centralized, approach to environmental protection. What if private or state cleanup efforts really do somehow interfere with federal interests? Congress didn't neglect the possibility. But instead of requiring state officials and local landowners to beg Washington for permission, Congress authorized the federal government to seek injunctive relief in court. See § 9606(a). Atlantic Richfield would have us turn this system upside down, recasting the statute's presumption in favor of cooperative federalism into a presumption of federal absolutism.
While I agree with the Court's assessment in Parts I and II of its opinion that we have jurisdiction to hear this case, I cannot agree with its ruling on the merits in Part III. Departing from CERCLA's terms in this way transforms it from a law that supplements state environmental restoration efforts into one that prohibits them. Along the way, it strips away ancient common law rights from innocent landowners and forces them to suffer toxic waste in their backyards, playgrounds, and farms. Respectfully, that is not what the law was written to do; that is what it was written to prevent.

Not admitted in the District of Columbia; admitted only in California; practice supervised by principals of Morrison & Foerster LLP admitted in the District of Columbia.

We may not decide the merits of a case without assuring ourselves that we have jurisdiction, Steel Co. v. Citizens for Better Environment , 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), but nothing requires us to decide whether the Montana courts have jurisdiction before remanding, see S. Shapiro et al., Supreme Court Practice § 3.26, p. 3-94 (11th ed. 2019); cf. Andresen v. Maryland , 427 U.S. 463, 469, n. 4, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (declining to address question presented "does not, of course, affect our jurisdiction").

The Court answers that §§ 113(b) and (h), though partially overlapping, are "independent" of each other. Ante, at 1351 - 1352, and n. 6. But this conclusion rests on an uneasy premise: that § 113(b) pertains only to causes of action based on CERCLA. There is reason to doubt that this is the best reading of the statute. See supra , at 1358 - 1359 and this page.

The Court chalks up § 113(b)'s references to amount in controversy and party citizenship to a "belt and suspenders" approach. Ante, at 1350, n. 5. As the Court sees it, Congress must have wanted to make especially clear that "all CERCLA lawsuits," no matter the amount in dispute or the citizenship of the parties, would be welcome in (and limited to) those courts. Ibid.
It is true that "instances of surplusage are not unknown" in federal statutes. Arlington Central School Dist. Bd. of Ed. v. Murphy , 548 U.S. 291, 299, n. 1, 126 S.Ct. 2455, 165 L.Ed.2d 526 (2006). But it is also the case that the Court usually seeks to "avoid a reading which renders some words altogether redundant." Gustafson v. Alloyd Co. , 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). In interpreting § 113, one way to avoid redundancy is to acknowledge the interlocking relationship between §§ 113(b) and (h). Section 113(b) refers to the hallmarks of diversity jurisdiction (amount in controversy and diversity), and § 113(h) makes clear that its clawback of jurisdiction over some "challenges" to EPA plans does not affect state-law claims that satisfy 28 U.S.C. § 1332.

They also retain jurisdiction over claims "under State law which is applicable or relevant and appropriate under [§ 121] (relating to cleanup standards)." § 113(h).